_____
)
**BRT MANAGEMENT LLC,**                    )
                                          )
    **Plaintiff/**                      )
    **Counterclaim Defendant,**         )
                                          )   **Civil Action No.**
    **v.**                             )   **17-10005-FDS**
                                          )
**MALDEN STORAGE, LLC and PLAIN**          )
**AVENUE STORAGE, LLC,**                   )
                                          )
    **Defendants/**                     )
    **Counterclaim Plaintiffs/**        )
    **Third-Party Plaintiffs,**         )
                                          )
**and**                                    )
                                          )
**BRIAN WALLACE,**                         )
                                          )
    **Third-Party Defendant.**          )
_____ )

**MEMORANDUM AND ORDER ON**
**MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

This action involves a dispute arising out of construction contracts to build storage

facilities.  Jurisdiction is based on diversity of citizenship.

There are three contracts at the center of this dispute.  The first was between plaintiff

BRT Management LLC, as design-builder, and defendant Plain Avenue Storage, LLC, as owner,

for the design and construction of a storage facility in New Rochelle, New York.  The second

was between BRT, as design-builder, and defendant Malden Storage, LLC, as owner, for the

design and construction of a storage facility in Malden, Massachusetts.[1]  The third was an earlier

contract between BRT and Lynn Storage, LLC, to remodel a building in Lynn, Massachusetts.

Plain, Malden, and Lynn are affiliated with one another and with Banner Development, LLC.

In substance, the dispute concerns the alleged existence of a secret or unwritten

agreement to divert funds paid by Plain to BRT (in connection with the New Rochelle project)

and by Malden to BRT (in connection with the Malden project) to the Lynn project.  BRT and

Wallace allege that there was such an agreement, and that the money was used by BRT to pay its

subcontractors and suppliers for extra work performed on the Lynn project, or to reimburse itself

for payments made to those subcontractors and suppliers for that extra work.  Plain and Malden

deny the existence of any such agreement, and allege that BRT and third-party defendant Brian

Wallace, the sole managing member and principal of BRT, converted a total of $327,282 from

them.  They further allege that BRT and Wallace repeatedly submitted fraudulent sworn

statements and pay applications to induce and conceal the conversion of funds.

Wallace has moved for summary judgment on the third-party complaint brought by Plain

and Malden and Plain and Malden have moved for partial summary judgment on their claims for

conversion and fraud.  For the following reasons, both motions will be denied.

## I.     Background

Except where otherwise noted, the following facts are set forth in the record and are

undisputed.

### A.     Factual Background

BRT Management LLC is a Massachusetts limited liability company.  (Compl. ¶ 1; First

---

[1] Based on the filings of the parties, it appears that Plain and Malden set off the abbreviation "LLC" with a comma, and BRT does not.

Am. Counterclaim ¶ 3). Brian Wallace, a resident of Massachusetts, is the sole managing member and principal of BRT. (Wallace SOF ¶ 4; First Am. Third-Party Compl. ¶ 4).

Banner Drive Storage, LLC is a Delaware limited liability company. (Compl. ¶ 4). Gary Delaney is the former president of Banner Storage Group, LLC, a limited liability company, and apparently has a management role at Banner Drive Storage. (Delaney Dep. at 20).[2]

Plain Avenue Storage, LLC and Malden Storage, LLC are Delaware limited liability companies. (First Am. Counterclaim ¶¶ 1-2). Plain and Malden are affiliated with Banner. (Defs. SOF ¶ 3).

William "Bill" Henry is the President of Banner Development, LLC and functioned as the project executive for the New Rochelle and Malden projects. (B. Henry Dep. at 27; B. Henry Aff. ¶ 2). Lori Radcliff is the project coordinator at Banner who was responsible for payment processing on the New Rochelle and Malden projects. (Radcliff Dep. at 19-21).

### 1. Lynn Project

Banner and BRT first became involved in 2014 when they contracted to remodel a building in Lynn, Massachusetts, in order to convert it into a storage facility. (B. Henry Dep. at 47-48; Wallace Dep. at 38-39). The owner of the facility was Lynn Storage, LLC, a Banner affiliate. BRT was the design-build contractor.

On February 18, 2015, Bill Henry of Banner sent an e-mail to Brian Wallace of BRT with a final log of submitted change orders—that is, a list of changes to the scope of work from the original contract—for the Lynn project. The changes were numbered 16 through 26 and had a

---

[2] The parties refer, at various times, to Banner Drive Storage, LLC; Banner Storage Group, LLC; and Banner Development, LLC. It is not clear to the Court whether these are, in fact, one, two, or three separate entities bearing the Banner name. For ease of understanding, and because it is far from clear from the parties' submissions, the Court will simply refer to those LLCs as "Banner." The differences, if any, between the various Banner LLCs do not appear to be relevant to any of the issues raised in the pending motions.

total cost of $478,171. (Defs. Ex. 10). The final change-order log included a "deductive" change order totaling $178,171, so that the total price was $300,000. (*Id.*). On March 11, Henry sent an e-mail to Gary Delaney of Banner stating that he wanted to "review the deductive change order to make sure it closes out all past and future change orders and the project." (Defs. Ex. 11).

Plain and Malden contend that Lynn Storage agreed with BRT to settle the change orders for a payment of $300,000. (Defs. SOF ¶ 11). BRT and Wallace, however, allege that instead, "Banner arranged with BRT to pay BRT for parts of its work on the Lynn Project . . . through two separate construction projects, the Malden Project and the New Rochelle Project." (BRT and Wallace Resp. to Defs. SOF ¶ 11).

Change orders 16 through 26 were then executed by BRT and Lynn Storage. (Defs. Ex. 12). Henry testified that "[t]here was no talk about any other funds being exchanged" in addition to the $300,000 paid for change orders. (B. Henry Dep. at 249-50). He also testified that Delaney suggested that they "provide Brian [Wallace] an opportunity to get" either the New Rochelle or Malden projects. (*Id.* at 250). Delaney testified that "the understanding" following the discussion surrounding the deductive change order was that Wallace, presumably acting as sole managing member and principal of BRT, would be the general contractor for the New Rochelle and Malden projects. (Delaney Dep. at 23-24).

The Lynn project was completed on June 10, 2015, when Wallace signed the "Subcontractor Final Payment Certification, Release and Final Lien Waiver," representing that BRT was not owed money under the Lynn project general contract. (Defs. Ex. 13).

On June 18, 2015, Lynn Storage sold the storage facility to Sovran Acquisition Limited Partnership, operating as Uncle Bob's Storage. (Defs. Ex. 14). On June 19, 2015, Wallace

signed a "Certification, Waiver of Lien and Release of Claims" to receive a final payment of $241,701.76. (Defs. Ex. 15). That same day, Wallace signed an "Estoppel Certificate" with Uncle Bob's stating that "[a]ll payments, charges and other costs owed under the General Contract have been paid in full and are current." (Defs. Ex. 16).

Uncle Bob's requested that BRT perform extra work on the Lynn facility, to be paid by Lynn Storage. (Defs. Ex. 17). BRT drafted a punch-list of additional work with a total cost of $291,818.69. (*Id.*). BRT was paid $322,081.88 in total for the additional work, including $291.818.69 under the original punch-list plus $48,988.09 in extra work, less a $18,725 sale credit reimbursement. (Weinheimer Aff. ¶ 3; Defs. Exs. 18-26).

## 2. <u>New Rochelle Contract</u>

On January 13, 2016, Plain, as owner, and BRT, as design-builder, executed a contract to build a storage facility located at 22 Plain Avenue, New Rochelle, New York. (Defs. Ex. 27). The contract had a guaranteed maximum price of $7,838,882 and required substantial completion of the project within 365 days. (*Id.*). BRT, as design-builder, was to receive a $383,500 lump-sum payment and up to an additional $783,888 in design-builder fees, which included overhead and profit on the cost of work. (*Id.*). The contract was signed by Wallace on behalf of BRT. (*Id.*).[3]

Plain and Malden contend that BRT then contracted with Storage Structures Inc., to supply and construct steel for the New Rochelle project. (Defs. Ex. 29 at No. 10). BRT, however, contends that it never executed a written contract with Storage Structures, and instead entered into oral agreements with the company "to perform early design work" for the project. (Wallace Aff. ¶¶ 21-22).

---

[3] According to Wallace, "Exhibit 27 is not the New Rochelle Contract." "Notwithstanding," he does not dispute that "the actual contract" contained the above provisions. (BRT and Wallace Resp. to Defs. SOF ¶¶ 35, 39).

Plain made three payments to BRT between June 9, 2015, and January 26, 2016. Of those payments, $224,900 was payment for invoices submitted by BRT for steel from Storage Structures. (Defs. Exs. 29, 31, 33-34, 36, 38, 43). BRT certified and submitted sworn statements and pay applications to Plain on the New Rochelle project representing that $224,900 had been paid to Storage Structures. (Defs. Ex. 79).

However, Heath Mulkey, the president of Storage Structures, testified that BRT only paid Storage Structures $39,900 of the $224,900 that it had been paid by Plain—that is, $185,000 less than the total amount for which BRT submitted Storage Structures invoices. (Mulkey Dep. at 34, 36). Ultimately, BRT neither paid the $185,000 difference to Storage Structures nor returned it to Plain. (B. Henry Aff. ¶¶ 3-5; Defs. Ex. 31 at No. 20).

Wallace, however, denies that BRT kept the $185,000. He alleges that BRT instead used the $185,000 "to pay its subcontractors and suppliers for extra work performed on the Lynn Project" and that it did so "at the request of Banner." (BRT and Wallace Resp. to Defs. SOF ¶ 45).

### 3.    Malden Contract

On February 3, 2016, Malden, as owner, and BRT, as design-builder, executed a contract to build a storage facility located at 490 Eastern Avenue, Malden, Massachusetts. (Defs. Ex. 28). The contract had a guaranteed maximum price of $7,219,173 and required substantial completion of the project within 335 days. (*Id.*). BRT was to receive a $350,010 lump sum, and up to an additional $721,917 in design-builder's fees, which included overhead and profit on the cost of work. (*Id.*). Again, Wallace signed the contract on behalf of BRT. (*Id.*).[4]

Plain and Malden contend that on October 9, 2015, BRT contracted with Storage

---

[4] According to Wallace, "Exhibit 28 is not the Malden Contract." "Notwithstanding," he does not dispute that "the actual contract" contained the above provisions. (BRT and Wallace Resp. to Defs. SOF ¶¶ 37, 40).

Structures to supply and construct steel for the Malden project. (Defs. SOF ¶ 62; Defs. Ex. 44). BRT alleges that it never executed a written contract with Storage Structures, and instead entered into oral agreements with them "to perform early design work" for the Malden project. (Wallace Aff. ¶¶ 21-22).

On October 21, 2015, Malden made a payment to BRT, $165,000 of which was payment for invoices submitted by BRT for steel from Storage Structures. (Defs. Ex. 31 at No. 4; Defs. Exs. 46-48). BRT certified and submitted sworn statements and pay applications to Malden representing that $165,000 was paid to Storage Structures. (Defs. Ex. 79). On June 14, 2016, BRT sent a check to Storage Structures for $22,718, which was later returned for lack of sufficient funds. (Defs. Exs. 51-52). On July 21, 2016, BRT again paid Storage Structures $22,718, in addition to a $30 service fee for the previously returned check. (Defs. Exs. 54-56).

Wallace admitted that BRT made no additional payments to Malden, and neither paid the $142,282 difference to Storage Structures nor returned it to Malden. (Defs. Ex. 31 at No. 5; B. Henry Aff. ¶¶ 3-5). BRT denies that it kept the $142,282. (Defs. Ex. 31 at No. 8). Instead, BRT and Wallace allege that BRT used the $142,282 "to either pay its subcontractors and suppliers money owed from the extra work performed on the Lynn Project or reimburse itself for payments made to its subcontractors and suppliers for the extra work performed on the Lynn Project." (BRT and Wallace Resp. to Defs. SOF ¶ 77).

### 4. Alleged Verbal Agreement Following the Lynn Project

The principal dispute is whether there was a verbal agreement between Brian Wallace (of BRT) and Bill Henry (of Banner) concerning the payment of additional fees on the Lynn project. Essentially, BRT and Wallace allege that at the completion of the Lynn project, Lynn Storage was financially unable to pay BRT; that Lynn Storage wanted to defer payments to BRT, so that

the project would appear more profitable to its lender and investors; and that there was a verbal agreement between Wallace and Henry whereby BRT would be paid the money it was owed on the Lynn project from funds paid for the New Rochelle and Malden projects. Specifically, the alleged verbal agreement was that BRT would divert payments totaling $350,000: $185,000 on the New Rochelle project and $165,000 on the Malden project.[5]

Wallace and Audrey Dreyfus (the controller for BRT) testified to the existence of the alleged verbal agreement. (Dreyfus Dep. at 326-38; Wallace Aff. ¶¶ 5, 19; Wallace Dep. at 133-39, 205, 214). Wallace testified that both Delaney and Frank Quigley (who was hired by Banner as the construction manager on the Lynn project and was later hired by BRT to serve as the construction manager on the Malden project), were present at the meeting where the alleged verbal agreement was reached between Henry and Wallace. (Wallace Dep. at 214).

Plain and Malden deny the existence of any such agreement. Henry and Delaney (of Banner) both testified that there was no such agreement. (B. Henry Aff. ¶¶ 7-8; Delaney Aff. ¶¶ 2-11; Delaney Dep. at 258-59, 267-68).[6]

In response to and "[r]egardless of [those] denials," BRT and Wallace point to the following evidence that (they contend) supports the existence of the verbal agreement:

- "As soon as Gary [Delaney] got on the phone [with Wallace while Dreyfus was present,] he began to discuss the money owed to BRT from the Lynn Storage job and how dividing it between both Malden and New Rochelle was the best way." (Defs. Ex. 82, BRTLYNN00588, 12/6/16 E-mail from Dreyfus to Wallace).

- "Other than at the meeting, we did a final walk-through of the [Lynn] project and had that conversation, that [Wallace] was asked to take a haircut and that it would

---

[5] Wallace alleges that while the Storage Structures payments of $185,000 and $165,000 for the New Rochelle and the Malden projects, respectively, were "meant to be for BRT as payment for the Lynn Project," the original agreement "was not specific as to the details of how the money owed to BRT on the Lynn Project would be paid." (BRT and Wallace Resp. to Defs. SOF ¶¶ 81-82; Wallace Dep. at 212-19).

[6] Delaney further denies that there was any discussion of deferring payments to make the Lynn project appear more profitable. (Delaney Dep. at 266).

be made up to him on Malden and New Rochelle." (Delaney Dep. at 25).

- "[A]t that meeting it was told to Brian [Wallace] that they would make—he would be made up—made whole—or made up to him on the Malden/New Rochelle Project." (*Id.* at 256-57).

- "I heard conversations about . . . [how] the balance owed [to Wallace on the Lynn project] would be paid on another job." (Quigley Dep. at 21).[7]

- "Brian [Wallace], I just talked with Gary [Delaney] he said he has arranged to pay the change order with the other work." (Wallace Ex. F, BRTPAS00033964, 6/17/15 E-mail from B. Henry to Wallace).

- "Bill Henry stated that the approximately $180,000.00 owed to BRT for BRT's change order work on the Lynn Project would be paid to BRT through a separate construction project in New Rochelle, New York . . . ." (Wallace Ex. E, McLaughlin Aff. ¶ 14).

In response to discovery requests for any documents evidencing the alleged agreements following the Lynn project, BRT stated, in essence, that it had no such documents. (Defs. Ex. 58 at Nos. 21-22).

B. **Procedural Background**

On January 3, 2017, plaintiff BRT Management LLC filed this action against defendants Malden Storage, LLC; Plain Avenue Storage, LLC; and Banner Drive Storage, LLC. The complaint asserts eight claims, all under Massachusetts law. Counts One through Six allege parallel common-law claims for breach of contract, quantum meruit and unjust enrichment, and breach of the covenant of good faith and fair dealing, respectively, against Plain (Counts One, Two, and Three) and Malden (Counts Four, Five, and Six). Counts Seven and Eight are claims against Malden only for violations of Mass. Gen. Laws ch. 149, § 29E, concerning construction contracts (Count Seven), and for unfair and deceptive trade practices under Mass. Gen. Laws ch.

---

[7] Quigley's testimony on this point was inconsistent. He testified that he was on-site at the Lynn project when he "heard conversations about [the alleged agreement]." However, he also testified that he was "not privy to" financial discussions that took place between Henry, Delaney, and Wallace, and that he "drifted away" when such discussions took place. (*See* Quigley Dep. at 21-23).

93A, § 11 (Count Eight).[8]

On March 7, 2017, Plain and Malden counterclaimed against BRT and filed a third-party complaint against Brian Wallace. On March 24, they jointly filed an amended counterclaim against BRT and an amended third-party complaint against Wallace.

The amended counterclaim asserts claims under New York and Massachusetts law for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, tortious interference with advantageous relations, and fraud by Plain (Counts One through Five) and by Malden (Counts Seven through Eleven). The amended counterclaim also asserts state-law statutory claims against BRT for deceptive business acts and practices under N.Y. Gen. Bus. Law § 349 (Count Six), and for unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A, § 11 (Count Twelve).[9]

The amended third-party complaint alleges claims against Wallace under New York and Massachusetts law for conversion, tortious interference with advantageous relations, and fraud with respect to the Plain (Counts Three, Four, and Five) and Malden (Counts Nine, Ten, and Eleven) contracts.

On August 7, 2017, the Court granted an assented-to motion to dismiss Banner from the litigation.

After the close of discovery, Wallace moved for summary judgment on the third-party complaint of Plain and Malden. Plain and Malden have moved for partial summary judgment on their conversion and fraud counterclaims and third-party claims against BRT and Wallace, respectively.

---

[8] Count Eight was also asserted against Banner.

[9] The parties do not appear to dispute that Massachusetts law applies to the claims arising out of the Malden project, and that New York law applies to claims arising out of the New Rochelle project.

## II.    <u>Standard of Review</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

## III.    <u>Analysis</u>

### A.    <u>Wallace's Motion for Summary Judgment on the Amended Third-Party Complaint</u>

The amended complaint of Plain and Malden asserts six claims against Wallace as a third-party defendant.  In Counts Three, Four, and Five, Plain alleges claims for conversion, tortious interference with advantageous relations, and fraud, respectively, with respect to the New Rochelle contract.  In Counts Nine, Ten, and Eleven, Malden alleges parallel claims with

respect to the Malden contract.

Wallace has moved for summary judgment on all counts, contending that the third-party complaint is procedurally defective under Fed. R. Civ. P. 14(a). He further contends that the claims against him fail under New York and Massachusetts law because there is insufficient evidence to pierce the corporate veil and hold him personally liable for the claims against BRT, and because the allegations of conversion and tortious interference are insufficient as a matter of law. Finally, he contends that fraud is not pleaded with particularity as required by Fed. R. Civ. P. 9(b).

### 1.     Whether Wallace is a Proper Third-Party Defendant

Fed. R. Civ. P. 14(a)(1) provides that "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." The nonparty who is so served becomes the "third-party defendant." Fed. R. Civ. P. 14(a)(2).

The purpose of Rule 14(a) is to enable the defendant "to transfer to the third-party defendant the liability asserted against the defendant by the original plaintiff." Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1446. As a result, the rule "does not allow the defendant to assert a separate and independent claim even though the claim arises out of the same general set of facts as the main claim." *CrossFit, Inc. v. Mustapha*, 2014 WL 3499589, at *1 (D. Mass. July 10, 2014) (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 698 (8th Cir. 2003)). If the claim is "separate or independent from the main action," a third-party complaint is inappropriate. *Id.*; *Katz v. Denn*, 2007 WL 763896, at *6 (D. Mass. Mar. 12, 2007) (quoting *F.D.I. C. v. Bathgate*, 27 F.3d 850, 873 (3d Cir. 1994)); *see also Lehman v. Revolution Portfolio L.L.C.*, 166 F.3d 389, 393 (1st Cir. 1999). "A third-party claim may be asserted under Rule 14(a)(1) only when the

12

third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to the defending party." Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1446 (internal footnote omitted).

Here, Wallace contends that the third-party complaint should be dismissed because it is devoid of any allegations that his liability is dependent on the outcome of BRT's claims against Plain and Malden; instead, it simply asserts a variety of tort claims against him personally. In that respect, he is correct, and it was improper to join him as a third-party defendant. *See CrossFit*, 2014 WL 3499589, at *2 (dismissing third-party complaint because "the claims against [the third-party defendant], as alleged, are not derived from [the plaintiff's] claims against [the defendant]"); *Katz*, 2007 WL 763996, at *6-7 (dismissing third-party complaint because it "in no way alleges, or even suggests, that the third-party defendants are secondarily or derivatively liable for plaintiff's claim against [defendant]"); *Damar Inc. v. Advanced Global Design, Inc.*, 1998 WL 967549, at *1-2 (E.D. Pa. Nov. 19, 1998) (dismissing third-party complaint for failure to allege derivative or secondary liability).

Nonetheless, a claim by Plain and Malden against Wallace is procedurally appropriate if he could be permissively joined under Rule 20(a)(2). Pursuant to Fed. R. Civ. P. 20(a)(2), permissive joinder of defendants is proper if the following two conditions are satisfied: "(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."

Clearly, there are questions of law or fact common to the claims alleged against Wallace and the counterclaims of Plain and Malden against BRT, and Wallace's alleged tortious conduct arises out of the same series of transactions or occurrences as their counterclaims against BRT

arising out of the New Rochelle and Malden projects. Wallace can therefore be permissively joined under Fed. R. Civ. P. 20(a)(2). Accordingly, summary judgment will not be granted in favor of Wallace for improper assertion of a third-party complaint. Instead, he will be deemed to be a counterclaim defendant, and the pleadings will be recast accordingly.

**2.**      <u>**Whether the Claims Require Piercing the Corporate Veil**</u>

The next issue is whether Wallace can be held personally liable for any of the claims made by Plain and Malden. Wallace argues that summary judgment in his favor should be granted as to all claims because he cannot be held responsible for the obligations of BRT absent a piercing of the corporate veil.

That argument is correct, as far as it goes: Wallace cannot be held personally responsible for the obligations of BRT without a showing that he personally guaranteed or otherwise had responsibility for those obligations, or that the corporate form should be disregarded. The problem, though, is that Plain and Malden are not seeking to hold Wallace personally liable for the debts or other contractual obligations of BRT. Instead, they have asserted claims against him directly for three types of intentional tort: conversion, tortious interference with advantageous relations, and fraud. He is thus being sued for actions he undertook personally, not because he should be held responsible for the acts of the LLC.

"Under Massachusetts law, corporate officers are personally liable for any tortious activity in which they personally participate." *Chesterton Capital, LLC v. Holley*, 2017 WL 6209189, at *13 (D. Mass. Dec. 8, 2017) (quoting *Frontier Mgmt. Co. v. Balboa Ins. Co.*, 658 F. Supp. 987, 991 (D. Mass. 1986)). Under New York law, for purposes of the New Rochelle contract, "corporate officers may be held personally liable for their tortious acts . . . even if they are made on behalf of the corporate entity." *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d

14

427, 461 (E.D.N.Y. 2013); *see also Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994)

("Though such individuals are not generally liable for their corporation's debts or its breach of a

contract . . . officers and directors of a corporation may be held liable for fraud if they participate

in it or have actual knowledge of it.") (citations and internal quotation marks omitted).

Because Wallace can be held personally liable for his tortious acts under Massachusetts

and New York law, summary judgment will not be granted for lack of evidence that the

corporate form should be disregarded.

### 3. Whether the Claims Should Be Dismissed for Failure to State a Claim

Wallace further argues that summary judgment should be granted in his favor because the

three claims (conversion, tortious interference, and fraud) are not supported by sufficient

allegations. Although purportedly a motion for summary judgment, his argument is cast in terms

of the legal insufficiency of the claims, and he has offered little evidence in support (other than

copies of the contracts, which, while relevant, are plainly insufficient to support a motion for

summary judgment). In substance, therefore, he is contending that he is entitled to judgment on

the pleadings under Fed. R. Civ. 12(c), and accordingly the Court will address his arguments

pursuant to the standard for judging such a motion.

A Rule 12(c) motion for judgment on the pleadings "is treated much like a Rule 12(b)(6)

motion to dismiss." *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008). It differs

from a Rule 12(b)(6) motion primarily because it is filed after the close of pleadings and

"implicates the pleadings as a whole." *Aponte-Torres v. University of Puerto Rico*, 445 F.3d 50,

54-55 (1st Cir. 2006). Because a Rule 12(c) motion "calls for an assessment of the merits of the

case at an embryonic stage," the court must view the facts contained in the pleadings in the light

most favorable to the non-moving party and draw all reasonable inferences to his or her benefit. *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006).

However, to survive a motion for judgment on the pleadings, a complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). The court will therefore grant Wallace's motion for judgment on the pleadings if Plain and Malden's well-pleaded facts do not "possess enough heft to show that [they are] entitled to relief." *Ruiz Rivera v. Pfizer Pharm.*, LLC, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

### a. Conversion

Wallace contends that the conversion claims against him fail because they rely on conclusory language that he "knowingly and intentionally" converted sums from Plain and Malden, without specifying whether he acted on his own behalf or on behalf of the company, or whether he exercised dominion or control over the relevant funds for his own use, as opposed to for the company's benefit.

Those contentions, in substance, rely on his argument that the corporate veil must be pierced in order to hold him directly liable for any torts he committed as an officer of BRT. Again, however, because a corporate officer can be found personally liable for his own tortious conduct, the counterclaim states a valid claim against Wallace individually for conversion.

### b.      **Tortious Interference**

Wallace next contends that the claims for tortious interference with advantageous

relations are insufficient.  Again, he disputes whether he can be held personally liable for tortious

acts undertaken on behalf of the company, which again is not a valid basis on which to dismiss

the claims.  He also contends that the counterclaim fails to allege any advantageous relations—

that is, any present or prospective contract or employment relationship—with the relevant third

parties:  the architects and engineers of the New Rochelle and Malden projects.[10]

Under Massachusetts law, in order to state a claim for the tort of intentional interference

with advantageous relations, a plaintiff must prove

> (1) he had an advantageous relationship with a third party (e.g., a present or prospective
> contract or employment relationship); (2) the defendant knowingly induced a breaking of
> the relationship; (3) the defendant's interference with the relationship, in addition to
> being intentional, was improper in motive or means; and (4) the plaintiff was harmed by
> the defendant's actions.[11]

*Blackstone v. Cashman*, 448 Mass. 255, 260 (2007); *see also Rando v. Leonard*, 2016 WL

3361662, at *3 (1st Cir. June 17, 2016); *Lashgari v. Zoll Med.*, 84 Mass. App. Ct. 1106, at * 2

(2013).[12]

As to the first element, "[a]lthough the plaintiff need not prove the loss or diminution of a

---

[10] In addition to the project architects and engineers, the third-party complaint alleges that Wallace also interfered with Malden's advantageous relationship with the building inspector of the City of Malden.  (First Am. Third-Party Compl. ¶¶ 107, 158, 161, 174).  Wallace does not address the allegations concerning the building inspector in his motion for summary judgment.

[11] For purposes of the New Rochelle contract, the elements of tortious interference with prospective economic advantage, as the tort is referred to under New York law, are similar.  "In New York State, to allege a tortious interference with prospective economic advantage claim, a plaintiff must allege that:  '(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'"  *Brown Media Corp. v. K & L Gates, LLP*, 586 B.R. 508, 529 (E.D.N.Y. 2018) (quoting *Catskill Dev., LLC v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).

[12] When interference with an actual contract is alleged, courts sometimes refer to the tort as "intentional interference with contractual relations."  *See, e.g.*, *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 652-53 (D. Mass. 2015).

fully formed contract, she must, at a bare minimum, prove harm to a 'probable future business relationship from which there is a reasonable expectancy of financial benefit . . . .'" *Sindi v. El-Moslimany*, 896 F.3d 1, 25 (1st Cir. 2018) (quoting *Owen v. Williams*, 322 Mass. 356, 362 (1948)). "Mere speculation regarding potential future business opportunities is insufficient to prove this element," however. *Id.* (citing *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 48 (1st Cir. 2002)).[13] "Rather, there must be competent evidence of a specific business relationship, the consummation of which was reasonably likely." *Id.*

The counterclaim alleges that Plain and Malden had advantageous relationships with the architects and engineers for the New Rochelle and Malden projects. (First Am. Third-Party Compl. ¶¶ 126, 158). It specifically alleges that the New Rochelle and Malden contracts required BRT (and Wallace) to obligate (through the use of specific contract language) each of its design professionals, including the project architect and engineer, to convey to Plain and Malden a non-exclusive license to use that design professional's "instruments of service" for the completion, use, and maintenance of the project if Plain or Malden assumed BRT's contractual duties and obligations, but BRT (and Wallace) failed to do so. (*Id.* ¶¶ 48-49, 105-06). Plain and Malden contend that if BRT (and Wallace) had fulfilled their obligations under the contracts, there would have been an advantageous relationship between the architects and engineers and Plain and Malden, and that the relationship would have continued in the event that BRT was terminated from the project.

The counterclaim further alleges that Wallace asked the project architects and engineers not to cooperate with Plain and Malden following the termination of the contracts. (*Id.* ¶¶ 45,

---

[13] A similar standard is applied under New York law. *See Brown Media Corp.*, 586 B.R. at 529 ("[M]ere suspicions are inadequate to support a claim for tortious interference with [prospective economic advantage].") (quoting *Scutti Enters. v. Park Place Entm't Corp.*, 322 F.3d 211, 217 (2d Cir. 2003).

102).  It further alleges that as a result of Wallace's actions, the architects and engineers refused to turn over their drawings and plans for the projects, or to cooperate with Plain and Malden regarding the completion of the projects, resulting in substantial delays.  (*Id.* ¶¶ 47, 104).  Wallace is therefore alleged to have caused Plain and Malden to lose the benefits of those relationships.  (*Id.* ¶¶ 129, 161).

Wallace contends that Plain and Malden had no existing contractual or employment relationships with the relevant architects and engineers at the relevant times.  He further contends that even if the allegations are true, the architects and engineers, who contracted with BRT directly, were under no obligation to continue any business relationship with Plain or Malden after BRT's work on the projects ended.

The essential question, then, is whether a non-exclusive license requirement is a "probable future business relationship from which there is a reasonable expectancy of financial benefit . . . .'"  *See Sindi*, 896 F.3d at 25.  At least one New York court has found allegations of interference with prospective licensing agreements sufficient to state a claim for tortious interference where it was "reasonably certain" that the prospective licensing agreements would have been entered into but for the defendant's interference.  *See Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1142-43 (S.D.N.Y. 1996).

Under the circumstances, the counterclaim pleads sufficient facts from which it can be inferred that but for Wallace's alleged wrongful interference, the project architects and engineers were reasonably likely to have entered into non-exclusive license agreements with Plain and Malden.  The counterclaim therefore alleges the first element of a tortious interference claim.

Alternatively, Wallace contends that Malden's tortious-interference claim fails because it fails to allege that Wallace acted with actual malice and without any legitimate corporate

interest, as required by Massachusetts law.

"Where a corporate official acting within the scope of his corporate responsibilities is sued for intentional interference with prospective economic advantage, it is not enough for the plaintiff to show interference by improper motive or means; instead, he must show that the corporate official acted with actual malice, meaning 'a spiteful, malignant purpose, unrelated to the legitimate corporate interest.'" *Stonewood Capital Mgmt., Inc. v. Giner*, 2013 WL 49771, at *2 (D. Mass. Jan. 3, 2013) (quoting *Blackstone*, 448 Mass. at 263).

Here, the alleged "improper purpose" that Malden has attributed to Wallace is his alleged desire to retaliate for its decision to terminate the Malden contract. (First Am. Third-Party Compl. ¶¶ 46, 103, 128, 160). Wallace contends that this amounts to mere speculation as to his retaliatory motive, which is insufficient to support a claim for tortious interference under *Wright v. Shriners Hospital for Crippled Children*, 412 Mass. 469, 476 (1992), and *American Translation Partners, Inc. v. Lahey Clinic Hospital, Inc.*, 2015 WL 9591327, at *3 (Mass. Super. Oct. 13, 2015). However, as a matter of pleading, the allegations clearly raise a plausible claim of an improper purpose sufficient to survive a motion for judgment on the pleadings. The motion will therefore be denied to the extent that it claims insufficient allegations of tortious interference.

### 4. Whether Fraud Was Pleaded with Particularity

Finally, Wallace contends that the counterclaim does not plead fraud with sufficient particularity. Again, in substance, his motion seeks a judgment in his favor on the pleadings, not summary judgment based on the undisputed facts.

Under Fed. R. Civ. P. 9(b), in cases "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The basic purposes of that

requirement are (1) to give the defendants notice and enable them to prepare a meaningful response; (2) to preclude the use of a groundless fraud claim as a pretext to using discovery as a fishing expedition; and (3) to safeguard defendants from frivolous charges that might damage their reputations. *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 170 (D. Mass. 2003) (quoting *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987)). Under the heightened pleading requirement, a complaint alleging fraud must state the time, place, and content of the alleged false or fraudulent representations. *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189-90 (1st Cir. 2006).

Here, the counterclaim alleges that Wallace perpetrated a fraudulent scheme in order to induce them to provide him with funds that he never intended to use for their lawful purpose. It specifically identifies a number of fraudulent representations that Wallace made during the course of that scheme. For example, it alleges that on each project, he used legitimate invoices from Storage Structures as a fraudulent pretense to obtain money from them. It further alleges that to conceal his conversion of $185,000 on the New Rochelle project and $142,282 on the Malden project, he repeatedly submitted false certified sworn statements with pay applications representing that all of the funds provided in response to those invoices were previously paid to Storage Structures. (First Am. Third-Party Compl. ¶¶ 54, 109, 134, 166). The counterclaim also attaches the alleged false or fraudulent pay applications, many of which appear to be signed and dated by Wallace, as exhibits to the third-party complaint. (*Id.* ¶¶ 54, 109, Exs. A & B). Taken together, those allegations and the attached pay applications state the time, place, and content of the alleged false or fraudulent representations, and therefore meet the heightened pleading standards of Fed. R. Civ. P. 9(b). *See Epstein*, 460 F.3d at 189-90.

Accordingly, Wallace's motion for summary judgment will be denied.

B.     **Motion for Partial Summary Judgment of Plain and Malden**

Plain and Malden have both moved for summary judgment on their claims for conversion and fraud against BRT and Wallace, as alleged in Counts Three, Five, Nine, and Eleven of the counterclaim and third-party complaint.

1.     **Conversion**

In Counts Three and Nine, Plain and Malden allege conversion by both BRT and Wallace.

Under Massachusetts law, a defendant is liable for conversion if he "intentionally or wrongfully exercise[s] acts of ownership, control or dominion over personal property to which he has no right of possession at the time . . . ."  *In re Brauer*, 452 Mass. 56, 67 (2008) (citations omitted).  "Money may be the subject of conversion."  *Pare v. Northborough Capital Partners, LLC*, 133 F. Supp. 3d 334, 337 (D. Mass. 2015) (citing *In re Hilson*, 448 Mass. 603, 611 (2007)).[14]

An action for conversion in Massachusetts further requires that "the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property."  *Kelley v. LaForce*, 288 F.3d 1, 11-12 (1st Cir. 2002).  "It is no defense to conversion for defendant to claim that he acted in good faith,

---

[14] The First Circuit has articulated the elements of the tort somewhat differently, holding that a plaintiff alleging conversion under Massachusetts law must show that:

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993); *see also Neelon v. Krueger*, 2015 WL 4647931, at *2 n.3 (D. Mass. Aug. 5, 2015) ("In cases where a defendant had legitimate possession of property, for example, a bailee holding goods for a bailor, Massachusetts law recognizes a further element that requires the plaintiff to have requested the property's return and been denied.").

reasonably believing that he had a legal right to possession of the goods." *Id.* at 12. "Moreover, '[c]onversion does not require an intent to deprive the owner permanently of the property . . . . Rather, one only need intent to exercise dominion or control over the property of another and can be held liable for conversion even if the property over which he exercised control was believed to be his own.'" *In re Zak*, 573 B.R. 13, 42 (Bankr. D. Mass. 2017) (quoting *In re Sloane*, 2002 WL 1000956, at *6 (Bankr. D. N.H. Mar. 25, 2002)).

For purposes of the New Rochelle contract, the elements of conversion are similar under New York law. "[A] plaintiff must establish that the defendant, acting without authorization, has exercised dominion or right of ownership over property belonging to the plaintiff, that the plaintiff has made a demand for the property, and the demand has been refused." *Bricklayers Ins. & Welfare Fund v. J.K. Merillin Builders, Inc.*, 2014 WL 6674404, at *5 (E.D.N.Y. Oct. 6, 2014). "A demand is not required, however, if demand would be futile because the circumstances show that the defendant knows it has no right to the goods." *Id.* (citing *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260-61 (2002)). "[T]o sustain a conversion claim, a plaintiff must allege acts that are unlawful or wrongful as distinguished from acts that are a mere violation of contractual rights." *Fraser v. Doubleday & Co.*, 587 F. Supp. 1284, 1288 (S.D.N.Y. 1984). "The tort of conversion 'is concerned with possession, not with title.'" *Bricklayers*, 2014 WL 6674404, at *5 (quoting *Seventh Regiment Fund*, 98 N.Y.2d at 259). "[I]t is well-settled that an action will lie under New York law for conversion of money when there is an obligation to return or otherwise treat in a particular manner the specific money in question." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (citation omitted).

Here, Plain and Malden contend that the undisputed facts establish that BRT and Wallace converted a total of $327,282 from them between the two contracts: $185,000 from

Plain on the New Rochelle project and $142,282 from Malden on the Malden project. They allege that for each project, BRT and Wallace received legitimate invoices from Storage Structures requesting payments for its services and/or a deposit to lock in the price of steel. BRT and Wallace then sent invoices to Plain and Malden requesting money to pay for the Storage Structures invoices. They further allege that they provided the requested funds to BRT and Wallace in response to those invoices and based on the representations therein that the requested money was necessary to pay Storage Structures. Instead of paying the money to Storage Structures, however, they allege that BRT and Wallace wrongfully kept a portion of the money, and refused to return the converted funds when asked to do so.

BRT and Wallace summarily oppose the motion for summary judgment, contending that "there are many material facts that are disputed that prevent the granting of the motion." They essentially point the Court to their statement of facts, in which they allege that Banner and BRT had a "furtive arrangement" to pay BRT for part of its work it performed on the Lynn project through the New Rochelle and Malden projects. They allege that "[t]his arrangement was made furtively" by Henry and Delaney, and was never reduced to writing because Banner intended to make the Lynn project appear more profitable to its investors than it actually was, and because Banner's arrangement with its lender did not cover the costs of all of the work required on the Lynn project. They allege that the terms of this "secret deal" were that BRT would be paid for two separate sums owed for part of its work on the Lynn project as preconstruction costs for the New Rochelle and Malden projects. They allege that some portion of the Storage Structures payments of $185,000 and $165,000 for the New Rochelle and the Malden projects respectively, were "meant to be for BRT as payment for the Lynn Project" plus interest, and therefore were retained by BRT according to the terms of the alleged secret agreement.

Plain and Malden reply that BRT and Wallace have offered no evidence of an enforceable modification to the contracts, and instead rely on inadmissible and deficient parol evidence—evidence of the so-called "secret deal"—to change the terms of the integrated contracts of the New Rochelle and Malden projects, the deductive change order, and the Lynn contract agreement for Uncle Bob's extras and additional extras. They contend that such evidence cannot be the basis for demonstrating a genuine issue of material fact, and therefore summary judgment should enter in their favor on the conversion claims against BRT and Wallace.

On balance, there is sufficient evidence of the alleged verbal agreement to survive summary judgment. In other words, there are genuine factual disputes as to whether BRT and Wallace wrongfully retained and refused to return a total of $327,282 that rightfully belonged to Plain ($185,000) and Malden ($142,282). And while Plain and Malden contend that the parol evidence rule bars evidence of such an agreement, they have moved for summary judgment on their tort claims of conversion and fraud, not the breach of contract claim. Whether or not there was a valid oral modification of the Lynn contract—perhaps the dispositive issue in their claims for breach of the New Rochelle and Malden contracts—is not a question that can be decided on a motion for summary judgment on their separate and independent tort claims. *See Slack v. James*, 364 S.C. 609, 616 (2005) ("Neither the parol evidence rule nor a merger clause in a contract prevents one from proceeding on tort theories of negligent misrepresentation and fraud.") (citation omitted); *Formento v. Encanto Bus. Park*, 154 Ariz. 495, 499 (Ct. App. 1987), *supplemented* (Aug. 4, 1987) ("The parol evidence rule is a rule of substantive contract law, and a claim of negligent misrepresentation sounds in tort. Therefore . . . the parol evidence rule is inapplicable.") (citations omitted).

Accordingly, the motion of Plain and Malden for summary judgment as to their conversion claims against BRT and Wallace will be denied.

### 2. <u>Fraud</u>

In Counts Five and Eleven, Plain and Malden allege fraud by both BRT and Wallace.

To prove a claim for fraud under Massachusetts law, a plaintiff must show that the defendant "made a false representation of material fact; for the purpose of inducing reliance; and that the plaintiff relied upon the representation to his or her detriment." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001). "Proof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge." *Id.* The claimant must in addition "set[] forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013) (quoting *North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009)).

For purposes of the New Rochelle contract, the elements of fraud are similar under New York law. "[A] plaintiff must show, by clear and convincing evidence, that the defendant made a material misrepresentation of fact," or an omission of a material fact coupled with a duty of disclosure, "knowing of its falsity and with the intent to induce reliance, and that the plaintiff justifiably relied on that misrepresentation to her detriment." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 491 (2d Cir. 2014) (citing *Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 349-50 (1999); *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)); *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 537 (S.D.N.Y. 2009).

Here, Plain and Malden allege that BRT and Wallace repeatedly submitted fraudulent sworn statements and pay applications to induce and conceal their conversion of funds. They

identify a number of allegedly fraudulent statements that they allege BRT and Wallace submitted to perpetuate their fraudulent scheme. For example, they allege that BRT and Wallace used legitimate invoices from Storage Structures as a fraudulent pretense to obtain money from Plain and Malden. They further allege that they detrimentally relied on those invoices and acted reasonably in providing the requested funds that purported to be for legitimate project purposes. Finally, they allege that BRT and Wallace had no intention to use those funds to pay Storage Structures, and intended to unlawfully keep the money instead.

Plain and Malden further allege that in order to fraudulently conceal their conversion, BRT and Wallace repeatedly submitted false certified sworn statements with pay applications representing that all of the funds provided to BRT by Plain and Malden were previously paid to Storage Structures. In fact, they allege, no such payments were made. By deceiving Plain and Malden into believing their funds were appropriately provided to Storage Structures, they allege, BRT and Wallace committed fraud.

In their opposition, BRT and Wallace again summarily contend there are genuine factual disputes that preclude summary judgment. Again, they point to their version of events involving a verbal agreement whereby BRT was to be paid for part of its work on the Lynn project through preconstruction costs for the New Rochelle and Malden projects.

Plain and Banner Storage reply that BRT and Wallace defend against the fraud claim by alleging, without any support apart from Wallace's own testimony, that Henry and Radcliff (of Banner) directed them to falsely fill out and sign the pay applications. They further contend that there is no evidence, again, apart from Wallace's own testimony, to support BRT and Wallace's allegation that Bill Henry (of Banner) directed BRT to submit invoices for preconstruction costs on the New Rochelle and Malden projects instead of having BRT submit additional requests for

payment on the Lynn project.  Finally, they repeat their contention that BRT and Wallace's reliance on inadmissible and misleading parol evidence to support the existence of a secret deal to pay BRT for part of its work on the Lynn project through the New Rochelle and Malden projects cannot be the basis for demonstrating a genuine issue of material fact.

Again, the evidence of a "secret deal" is sufficient to survive summary judgment.  There are genuine factual disputes as to whether, for example, Banner directed BRT and Wallace to fill out and sign false pay applications, and other statements representing that Storage Structures has been paid, when in fact BRT and Wallace retained the money as payment for part of BRT's work on the Lynn project.  Accordingly, the motion of Plain and Malden for summary judgment as to their fraud claims against BRT and Wallace will be denied.

**IV.** <u>**Conclusion**</u>

For the foregoing reasons,

1. The motion of Brian Wallace for summary judgment on defendants' amended third-party complaint is DENIED.

2. The motion of defendants Plain Avenue Storage, LLC and Malden Storage, LLC for partial summary judgment is DENIED.

**So Ordered.**

<u>s/  F. Dennis Saylor</u>
F. Dennis Saylor IV
Dated: August 23, 2019                    United States District Judge