# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____  )
)
**BRT MANAGEMENT LLC,**                   )
)
    **Plaintiff/**                    )
    **Counterclaim Defendant,**       )
)    **Civil Action No.**
    **v.**                           )    **17-10005-FDS**
)
**MALDEN STORAGE, LLC and PLAIN**         )
**AVENUE STORAGE, LLC,**                  )
)
    **Defendants/**                   )
    **Counterclaim Plaintiffs/**      )
    **Third-Party Plaintiffs,**       )
)
**and**                                   )
)
**BRIAN WALLACE,**                        )
)
    **Third-Party Defendant.**        )
_____  )

# FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
# MEMORANDUM AND ORDER ON MOTION TO STRIKE
# AND CROSS-MOTIONS FOR DIRECTED VERDICT

**SAYLOR, C.J.**

## I.    <u>Introduction</u>

This is a dispute between an owner and a contractor over the construction of two self-storage facilities, one in New Rochelle, New York, and one in Malden, Massachusetts. Plaintiff and counterclaim defendant BRT Management LLC is the contractor, and third-party defendant Brian Wallace is the principal of BRT. Defendants, counterclaim plaintiffs, and third-party plaintiffs Plain Avenue Storage, LLC and Malden Storage, LLC are entities created by the effective owner, a company doing business as Banner Real Estate Group. Jurisdiction is based

on diversity of citizenship.

The matter was tried to the Court without a jury between April 26 and May 6, 2021.  The Court's findings of fact and conclusions of law are set forth below.

## II.    Findings of Fact

### A.    Parties

1.      BRT Management LLC is a limited liability company based in Massachusetts. (Tr. 1:31).  It is owned by Brian Wallace, who is a resident of Massachusetts.  (*Id.*; Tr. 1:27).

2.      Malden Storage LLC and Plain Avenue Storage LLC (collectively, "Banner") are limited liability companies organized under Delaware law that are based in Illinois.  (Answer ¶¶ 2-3).  They are affiliated with Banner Storage Group, LLC.

### B.    The Lynn Project

3.      In 2014, Lynn Storage, LLC, which is also affiliated with Banner, contracted with BRT to remodel a storage facility in Lynn, Massachusetts.  (Tr. 1:34; Tr. 6:90-91; Tr. 8:6-8). That contract was the first contract between BRT and an affiliate of Banner.  (*Id.*).

4.      The Lynn project was nearly complete by the beginning of 2015.  (Tr. 6:95-96). Around that time, BRT submitted a series of change-order requests that totaled $478,171.  (Ex. 1558, at 1; Ex. 1021, at 16-24).

5.      Bill Henry, President of Banner, and Jim Merkey, Vice President of Construction for Banner, reviewed those requests.  (Tr. 6:97; Tr. 7:99).  Upon their initial review, they believed that most of the requests were associated with the design-build components of the contract, for which they thought BRT was responsible.  (Ex. 1348; Tr. 7:101).  They, along with Gary Delaney, who at that time was President of Banner, planned a visit to the Lynn site to meet with Wallace to discuss the change orders.  (Tr. 6:100; Tr. 7:106).

6.      On February 10, 2015—the day before the site visit in Lynn—Henry, Merkey,

2

and Delaney met in Boston and agreed that $300,000 was a fair settlement amount for the change

orders.  (Tr. 7:110).

7.      The following day, Henry, Merkey, and Delaney met with Wallace at the Lynn

site.  (Tr. 6:100; Tr. 7:107).[1]  At the end of that meeting, they offered Wallace $300,000 to settle

the change-order dispute.  (*Id.*).  They believed that the remaining $178,171 was contract work

for which BRT was responsible.  (Tr. 6:102; Tr. 7:107-08).

8.      Wallace was not happy with the offer but nonetheless accepted it.  (Tr. 6:102; Tr.

7:108-09).

9.      Because Wallace was not happy with the settlement, Henry informed Wallace that

Banner would give him the opportunity to work on a future project, which Banner would not put

out for bid.  (Tr. 6:109).  Banner subsequently offered the New Rochelle and Malden projects to

BRT without putting them out for bid.  (*Id.*).

10.      To execute the settlement, Banner agreed to approve the change orders totaling

$478,171, and Wallace agreed to submit a deductive change order in the amount of $178,171.

(Tr. 6:102; Ex. 1001).  Wallace submitted that change order on March 16, 2015.  (Tr. 3:105; Ex.

1021, at 25).

11.      On June 10, 2015, Wallace executed the "Subcontractor Final Payment

Certification, Release and Final Lien Waiver" before a notary public.  (Ex. 1004).  In doing so,

Wallace certified, among other things, that BRT had "received in full for all labor, materials, and

other items furnished in connection with improvements to real property or any other work

performed" for the Lynn project for work performed through June 10, 2015.  (*Id.*).  That

---

[1] Henry testified that Frank Quigley, who was hired by Banner as the construction manager on the Lynn project, was at the site visit.  (Tr. 6:10).  Merkey testified that the project architect was at the site visit.  (Tr. 7:107).

document states that the "Total Amount of Final Check" is $0.  (*Id.*).

12.     On June 19, 2015, Wallace confirmed by letter that Pay Application #10 was the "final" pay application on the Lynn project, which would result in $241,701.76 to be paid to BRT.  (Ex. 1006, at 1).  That letter included as an attachment an executed "Certification, Waiver of Lien, and Release of Claims," which Wallace described as a "full and final lien waiver," and wiring instructions.  (*Id.* at 1-4).

13.     That same day, Wallace executed an "Estoppel Certificate" with Sovran Acquisition Limited Partnership, which had purchased the facility from Lynn Storage.  (Ex. 1007).  Wallace certified, among other things, that "[a]ll obligations of the parties" under the construction contract between BRT and Lynn Storage "have been complied with."  (*Id.* at 1).  He further certified that "[a]ll payments, charges and other costs owed" under that contract "have been paid in full and are current."  (*Id.*).

14.     As a condition of purchase, a Sovran subsidiary, Uncle Bob's Storage, requested that certain work beyond the original contract between BRT and Lynn Storage be completed at the Lynn facility.  (Ex. 1008, at 6-7).  On July 13, 2015, BRT and Lynn Storage executed a "punch-list" contract for completion of that work.  (*Id.* at 2-5).  That contract provided that Lynn Storage would pay $291,818.69 to BRT for the punch-list work.  (*Id.* at 2).[2]

15.     BRT completed the punch-list work and was paid $291,818.79.  (Tr. 4:9-10; Ex. 1012; Ex. 1013; Ex. 1017).

16.     In addition to the punch-list work, BRT completed further "extra" work beyond the original contract.  (Ex. 1010, at 1).  That work was memorialized in a "Summary" document

---

[2] The punch-list contract included fixed-cost components, totaling $176,118.69, and components that were to be billed on a time-and-materials basis, which were not to exceed $115,700.  (Ex. 1008, at 2).

initialed by Lynn Storage and BRT representatives on June 26, 2015.  (*Id.*).  That document indicates that the cost of that "extra" work totaled $48,988.09.  (*Id.*).

17.     BRT completed the "extra" work and was paid $48,988.09.  (Ex. 1009).

**C.     The New Rochelle and Malden Contracts**

18.     In early 2016, after completion of the Lynn project, Banner, through its affiliates Plain Avenue Storage and Malden Storage, executed two contracts with BRT for construction of storage facilities.  (Tr. 6:125; Ex. 1026; Ex. 1182).

19.     The contract between Plain Avenue Storage and BRT called for construction of a storage facility in New Rochelle, New York.  (Ex. 1026, at 2).  It was executed on January 8, 2016, effective "as of" October 27, 2015.  (*Id.*).  It was amended in writing on April 19, 2016, to modify the insurance requirements imposed on BRT and its subcontractors.  (Ex. 1026.1).

20.     The Guaranteed Maximum Price ("GMP") for the New Rochelle contract was $7,838,882.  (Ex. 1026, at 6).[3]  BRT was to earn a lump sum of $383,500 and up to 4% of the cost of work for overhead and up to 6% of the cost of work for profit.  (*Id.*).

21.     The New Rochelle contract required that BRT achieve substantial completion of the work within 365 days from the date of commencement of the contract.  (*Id.* at 5).  The date of commencement was "upon receipt of all necessary permits, and full execution" of the contract, "whichever occurs last."  (*Id.* at 4).

22.     The contract between Malden Storage and BRT called for construction of a storage facility in Malden, Massachusetts.  (Ex. 1182, at 2).  It was executed on February 2, 2016, effective "as of" October 27, 2015.  (*Id.*).

---

[3] The Guaranteed Maximum Price represents the maximum amount BRT would charge Plain Avenue Storage "if [there were] no changes . . . for unperceived conditions."  (Tr. 1:48; *see also* Tr. 8:84 ("[T]he design-builder in this instance is guaranteeing that the price will not be above that maximum price.")).  It includes the cost of the work plus BRT's fee.  (Ex. 1026, at 6).

23.     The Guaranteed Maximum Price for the Malden contract was $7,219,173.  (*Id.* at 6).  BRT was to earn a lump sum of $350,010 and up to 4% of the cost of work for overhead and up to 6% of the cost of work for profit.  (*Id.*).

24.     The Malden contract required that BRT achieve substantial completion of the work within 335 days from the date of commencement of the contract.  (*Id.* at 5).  Like the New Rochelle contract, the date of commencement was "upon receipt of all necessary permits, and full execution" of the contract, "whichever occurs last."  (*Id.* at 4).

25.     The New Rochelle and Malden contracts included integration clauses:  "The Design-Build Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral."  (Ex. 1026, at 3; Ex. 1182, at 3).  The contracts also stated that the parties agree that BRT had "performed certain design work" before the execution of the contracts and that that work would be "included and governed" by the contracts.  (Ex. 1026, at 4; Ex. 1182, at 4).

26.     The New Rochelle and Malden contracts provided that the "[t]ime limits stated in the Design-Build Documents are of the essence of the Design-Build Contract."  (Ex. 1026, at 40; Ex. 1182, at 34).  They further provided that "[b]y executing the Design-Build Contract, the Design-Builder confirms that the Contract Time is a reasonable period for performing the Work" and that "[t]he Design-Builder shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time, subject to the terms and conditions herein."  (*Id.*).

27.     The New Rochelle and Malden contracts provided that progress payments would be based on the percentage of completion for each portion of work:  "Applications for Payment where the Contract Sum is based upon the Cost of Work Plus a Fee with a Guaranteed Maximum

6

Price shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment." (Ex. 1026, at 10; Ex. 1182, at 10). They detailed how the percentage of completion and the amount of each progress payment were to be calculated. (Ex. 1026, at 10-11; Ex. 1182, at 10-11).

28.     The New Rochelle and Malden contracts identified four ways by which they could be modified: "(1) a written amendment to the Design-Build Contract signed by both parties, (2) a Change Order, (3) a Construction Change Directive or (4) a written order for a minor change in the Work issued by the Owner." (Ex. 1026, at 3; Ex. 1182, at 3).

29.    The New Rochelle and Malden contracts provided a procedure by which disputes concerning claims for concealed or unknown conditions would be resolved:

> If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Design-Build Documents or (2) unknown physical conditions of an unusual nature which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Design-Build Documents, then the observing party shall give notice to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions.
>
> The Owner shall promptly investigate such conditions and, if they differ materially and cause an increase or decrease in, the Design-Builder's cost of, or time required for, performance of any part of the Work, shall negotiate with the Design-Builder an equitable adjustment in the Contract Sum or Contract Time, or both. If the Owner determines that the conditions at the site are not materially different from those indicated in the Design-Build Documents and that no change in the terms of the Design-Build Contract is justified, the Owner shall so notify the Design-Builder in writing, stating the reasons.
>
> Claims by the Design-Builder in opposition to such determination must be made within 21 days after the Owner has given written notice of the decision. If the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Design-Builder cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall proceed pursuant to Section A.4.2.

(Ex. 1026, at 35; Ex. 1182, at 29).

30.     The New Rochelle and Malden contracts included a document titled "Outline Specifications" as Exhibit E.  (Ex. 1026, at 79; Ex. 1182, at 77).  That document stated that BRT would provide "complete design/build services from furnishing of the design, coordinating the permits and entitlements, completing the construction, and turning over the building."  (Ex. 1026, at 82; Ex. 1182, at 80).  It further stated that BRT would "apply for, coordinate and obtain all required trade permits."  (Ex. 1026, at 84; Ex. 1182, at 81).[4]

31.     Exhibit E further provided that items not included in BRT's scope of work unless required by applicable codes include "[u]nforeseen conditions"; "[p]oor soils remediation including installation of deep foundations, surcharge loading, soil stabilization, moisture control of soil, sink hole remediation, undercutting and replacement of structurally unsound soils, etc, except as explicitly noted in the provided outline specification"; and "[r]emoval and/or disposal of underground or hidden obstructions, i.e. trash, toxics, rock, rubble, underground storage tanks., etc."  (Ex. 1026, at 102; Ex. 1182, at 99).

32.     Claims arising out of the New Rochelle and Malden contracts were "subject to mediation as a condition precedent to arbitration or the institution of legal or equitable or other binding dispute resolution proceedings by either party."  (Ex. 1026, at 37; Ex. 1182, at 30).[5]  If the parties did not resolve their dispute through mediation, "the method of binding dispute resolution [was] . . . [l]itigation in a court of competent jurisdiction."  (Ex. 1026, at 11-12; Ex.

---

[4] Exhibit E also stated that "[o]perating permits including, but not limited to business licenses, hazardous material permits, or environmental permits," would be provided by Banner.  (Ex. 1026, at 101; Ex. 1182, at 98).  Although the contract does not expressly refer to building or construction permits, the parties operated as if BRT were responsible for obtaining such permits.  (*See, e.g.*, Ex. 211.1 (proposed change order from BRT for, among other things, "fil[ing] for a special permit to allow asphalt, brick, Concrete, and soil recycling use of property")).

[5] The contracts defined a "claim" as "a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Design-Build Contract terms, payment of money, extension of time or other relief with respect to the terms of the Design-Build Contract."  (Ex. 1026, at 35; Ex. 1182, at 28).  It also included "other disputes and matters in question between the Owner and Design-Builder arising out of or relating to the Design-Build Contract."  (*Id.*).

1182, at 12).

33.     The New Rochelle and Malden contracts provided that Plain Avenue Storage or

Malden Storage could terminate the contracts for cause if BRT:

> 1.  persistently or repeatedly refuses or fails to supply enough properly skilled
> workers or proper materials;
>
> 2.  fails to make payment to Contractors for services, materials or labor in
> accordance with the respective agreements between the Design-Builder and the
> Architect and Contractors;
>
> 3.  persistently disregards laws, ordinances or rules, regulations or orders of a
> public authority having jurisdiction; or
>
> 4.  otherwise is guilty of substantial breach of a provision of the Design-Build
> Documents.

(Ex. 1026, at 52; Ex. 1182, at 46).

34.     The New Rochelle or Malden contracts provided that if a claim arising out of the

contract is decided by, among other things, litigation, the prevailing party in that dispute is

entitled to receive "all of its reasonable costs and expenses incurred in connection with such

litigation, . . . including reasonable attorneys' fees, filing fees, expert witness fees, discovery

expenses, and any other reasonable costs incurred in prosecuting or defending" the action.  (Ex.

1026, at 37; Ex. 1182, at 31).

> **D.**     **The New Rochelle Project**
>
> > **1.     Progress of Work**

35.     Before the execution of the New Rochelle contract, BRT entered into oral

contracts with KOH Architecture PLLC, JAG Engineering LLC, and Whitestone Geotechnical

Associates to perform certain architectural, engineering, and geotechnical services for the

project.  (Tr. 1:56-57).  They performed that work and were paid in full.  (*Id.*).  BRT invoiced

Plain Avenue Storage for that work.  (Tr. 1:104-105).

9

36.     Banner closed on the purchase of the site for the New Rochelle project on January 23, 2016.  (Tr. 7:25).

37.     Asbestos abatement, a process through which asbestos is removed from an existing structure, was scheduled to start on January 25.  (Ex. 1026, at 107; Tr. 7:26-27).  It was delayed, however, because BRT failed to provide a certificate of worker's compensation insurance, which was required by the City of New Rochelle before it would issue a building permit.  (Tr. 7:25-27).  BRT did not apply for that certificate until January 21.  (Tr. 7:25).  It obtained the certificate in early March.  (Tr. 7:25).

38.     The Notice to Proceed was issued on March 14.  (Ex. 1027, at 2).

39.     Asbestos abatement was scheduled to take ten days.  (Ex. 1026, at 107).  It took approximately 24 to 26 days.  (Tr. 7:27).

40.     Demolition was scheduled to start on February 8, to be completed by February 29.  (Ex. 1026, at 107).  BRT failed to timely apply for the demolition permit.  (Tr. 7:27-28).  The permit was issued on May 9, only after Plain Avenue Storage contacted New Rochelle officials, who informed Plain Avenue Storage that BRT was required to apply for the permit in person.  (*Id.*).  Demolition took more than two months to complete.  (*Id.*).  It finished on July 18.  (*Id.*).

41.     BRT was scheduled to excavate test pits in May 2016.  (Ex. 1026, at 108).  Whereas other soil-exploration techniques, such as borings, provide limited information concerning underground conditions, test pits allow for a more complete analysis of such conditions.  (Tr. 5:26).  They are intended to reveal the condition of the soil, including "organic layers and various fill," and the condition of the existing foundation.  (*Id.*).

42.     BRT did not start the test pits until June 30.  (Tr. 7:28).  They were completed on July 6, but the results were not provided to Plain Avenue Storage until five weeks later, on

10

August 12.  (*Id.*).

43.     Even by that date, approximately seven months after work was scheduled to begin, the New Rochelle site lacked several basic components of typical construction sites.  For example, it did not have a trailer, which would allow the site superintendent to manage the work and provide an on-site bathroom for workers to use.  (Tr. 7:30-32).  Henry visited the New Rochelle site on five occasions; on four of those occasions, no site supervisor was present.  (Tr. 7:31).

44.     By mid-August, the New Rochelle project was approximately 80 days behind schedule.  (Tr. 7:29).

### 2.     Change Orders #3 and #4

45.     Plain Avenue Storage contracted with Whitestone to produce geotechnical reports for the New Rochelle site.  (Tr. 7:34-35).  The geotechnical reports presented "the results of Whitestone's soils exploration efforts and . . . recommendations for design of the proposed structural foundations, pavements, and related earthwork associated with the proposed site redevelopment."  (Ex. 1341, at 2).  Whitestone produced three reports:  two before the execution of the contract between Plain Avenue Storage and BRT and one after the execution of that contract.  (Ex. 1341 (February 2015 report); Ex. 1342 (September 2015 report); Ex. 1343 (August 2016 report)).

46.     The findings and recommendations of the first two reports were "essentially" the same.  (Tr. 5:21).[6]  According to Ryan Roy, one of BRT's expert witnesses and a principal at Whitestone, there was "no reason to believe" based on the first two reports "that the existing

---

[6] The second report was based on "a handful of additional exploration borings" compared to the first report. (Tr. 5:21).

foundations would not be reused."  (Tr. 5:25).[7]

47.     JAG Engineering and KOH Architecture used the second Whitestone report to prepare their designs for the New Rochelle project.  (Tr. 1:41).  Their designs were approved by the City of New Rochelle in March 2016, when the city issued the building permit.  (Tr. 1:41-42).  That permit describes the work as an "[a]ddition to existing foundation to include four story building . . . ."  (Ex. 106.2, at 2).

48.     According to Wallace, the original plan for the New Rochelle project included (1) installing interior pier columns throughout the structure; (2) installing rigid inclusions in the center and eastern portions of the structure; and (3) reusing the existing perimeter foundation.  (Tr. 1:90-93; Ex. 110.1, at 3).  BRT's final budget for the New Rochelle project included $242,715 for ground-improvement work.  (Tr. 7:36-38; Ex. 1432, at 2-4).

49.     During demolition, BRT discovered, among other things, that some of the soil on site was unsuitable and that portions of the existing structure were supported by grade beams instead of foundation walls.  (Tr. 1:82-83; Tr. 2:7-8; Tr. 5:26).  Grade beams extend up to two feet below grade whereas foundation walls extend below the frost line.  (Tr. 1:83).  The New Rochelle building code did not allow for the structure to be built upon grade beams.  (*Id.*).

50.     After those discoveries, Whitestone was hired to complete the third geotechnical assessment.  (Tr. 1:84).  As part of that assessment, Whitestone excavated supplemental test pits.  (Tr. 1:84; Tr. 5:26).  The supplemental test pits included several along the structure's south side, where Whitestone had previously been unable to perform exploratory subsurface investigation because the existing building had not been demolished.  (Tr. 5:36-37; Ex. 1343, at 9).

---

[7] Roy did not participate in preparing the Whitestone reports for New Rochelle.  (Tr. 5:31).  Another Whitestone principal, Larry Keller, authored the reports, and Roy discussed them with him during the drafting process.  (Tr. 5:30-31).

51.     Whitestone provided the results of the third geotechnical assessment on August 12, 2016.  (Ex. 1343).  According to Roy, that assessment found, among other things, that "the existing foundations were not real foundations" and "were not compliant with current standards" and that soil stabilization was necessary for a larger area than originally anticipated.  (Tr. 5:26-27).

52.     BRT raised the issues concerning the subsurface conditions with Plain Avenue Storage.  (Ex. 110.3, at 1).  On August 9, 2016, Plain Avenue Storage responded that "[a]fter reviewing the Geotechnical reports of February 2, 2015 and September 3, 2015, it appears that Whitestone Associates, Inc. has not changed their geotechnical recommendations."  (*Id.*).  It further responded that "[a]bsent additional information indicating Whitestone's recommendations have changed or there is a significant change in the quantity of soils needing improvement, [Plain Avenue Storage would] not be able to approve [BRT's] proposed change order."  (*Id.*).

53.     A few days later, BRT again raised the issues concerning the subsurface conditions.  (Ex. 110.5, at 1).  Plain Avenue Storage requested that BRT submit a proposed change order that included (1) "[t]he original basis and design of [BRT's] GMP of foundations and associated sitework based on the geotechnical report recommendations from Whitestone" and (2) "[t]he revised basis and design for [BRT's] GMP of foundations and associated sitework based on the supplemental geotechnical report recommendations from Whitestone."  (*Id.*).  Plain Avenue Storage instructed BRT to "[h]ighlight in the report what recommendations have changed that have caused [its] scope of work to change that were not in the original report."  (*Id.*).

54.     On August 15, 2016, BRT submitted Change Order #3 for "[a]dditional ground

13

improvements not originally carried in base contract." (Ex. 1124, at 3).

55.     The next day, Plain Avenue Storage rejected that change order. It stated that "the original geotechnical report contains the same recommendations as the supplemental geotechnical report in regards to the ground improvements below foundations and floor slabs" and "both report recommendations included RAPs, CMCs, or overexcavation and recompaction and/or replacement of unsuitable existing fill and organic materials." (Ex. 110.7, at 1).[8] It concluded that the proposed work was "contract work" and that it was "BRT's responsibility . . . to provide a design that meets geotechnical requirements and design intent in the GMP contract." (*Id.*).

56.     During the second half of August 2016, BRT and Plain Avenue Storage went back and forth concerning potential change orders related to the subsurface conditions. (*See, e.g.*, Tr. 7:40-55; Exs. 110.8, 110.9, 110.10, 110.13. 110.14, 110.16, 110.22, 110.23, 110.24, 110.26). Several Plain Avenue Storage representatives, including Bill Henry, Rick Henry, Joe Zekian, and Jim Merkey, repeatedly reviewed the proposed change orders and supporting documentation, such as the contract documents and geotechnical reports. (Tr. 7:40-55). They visited the site multiple times to review the ground conditions. (Tr. 7:41-42). They requested that BRT submit specific supporting documentation in support of the potential change orders. (Ex. 1133).

57.     Around that time, Bill Henry met with Kent McCreedy, Banner's CEO, and Milt Pinsky, Banner's Chairman. (Tr. 7:55). They discussed Banner's "displeasure with everything

---

[8] Rammed aggregate piers ("RAPs") and controlled modulus columns ("CMCs") are ground-improvement techniques. (Tr. 5:21-24). RAPs are columns of compacted, crushed stone that are installed to stabilize the soil and support the foundation of a building. (Tr. 5:21-23). CMC is a trade name for rigid inclusions. (Tr. 5:23). Rigid inclusions are columns that include grout or cement, which prevents them from "bulb[ing] out," particularly in soft soils. (Tr. 5:23-24).

that was going on [with] the project and that it was getting more and more difficult to talk with [its] equity partners on the progress of the project . . . and . . . to get through the day-to-day with [Wallace]." (*Id.*). Banner decided to make a conditional offer to BRT in order to "try to get the project moving forward." (*Id.*). As noted, by mid-August, the New Rochelle project was approximately 80 days behind schedule. (Tr. 7:29).

58.     On September 1, 2016, Plain Avenue Storage sent a conditional offer concerning the proposed change orders to BRT. (Ex. 110.14, at 2). It stated that Plain Avenue Storage "deem[ed] 90% of the Rigid Inclusion work [to be] contract work and . . . BRT's responsibility" but that it "realize[ed] the project need[ed] to move forward and the budget hit may not be something BRT [could] absorb." (*Id.*). It further stated that, as a result, Plain Avenue Storage would accept Change Order #3 and the rigid-inclusion work in Change Order #4 if BRT would agree to the following conditions:

1. This letter becomes a part of Change Order #3 and Change Order #4.

2. If BRT would like to include all of the Rigid Inclusions in Change Order #3 that will be acceptable to Banner.

3. There will be zero additional days added to the schedule and no general conditions for any Rigid Inclusion work in Change Order #3 or Change Order#4 [sic]. Banner will allow overhead and profit per the terms of our contract.

4. BRT will provide Banner a detailed overall schedule 7 days after execution of Change Order #3.

5. BRT will provide a 3 week look ahead within 48 hours after execution of Change Order #3 that is in a format acceptable to Banner. . . .

6. BRT maintains its billing on general conditions, overhead and profit until the construction work in place catches up with the 25% completion as currently billed on the pay applications that BRT has been paid for. . . .

7. A meeting will be set up between Banner, the structural engineer and[] the geotechnical engineer within the next 7 business days in order to resolve the remaining issues on Change Order #4.

(*Id.*). The letter concluded that "[i]f BRT chooses not to accept these terms Banner may need to move forward to terminate the contract." (*Id.*).

59. Plain Avenue Storage's conditional offer was approximately $240,000, including approximately $24,000 of overhead and profit for BRT. (Tr. 7:49; Tr. 7:55).

60. On September 6, 2016, BRT twice submitted revised versions of Change Order #3. (Ex. 110.16, at 1; Ex. 110.18, at 1). The revised change orders included several errors, such as incorrect total amounts and failing to include the letter from Plain Avenue Storage concerning the conditions on which the change order would be accepted. (Ex. 110.17, at 1; Ex. 110.18, at 1). Plain Avenue Storage requested that BRT resubmit the change order. (*Id.*).

61. On September 8, 2016, BRT submitted a further revised change order and responded to Plain Avenue Storage's letter that conditionally accepted Change Order #3. (Exs. 1106, 1107). The response is unclear. It appears that BRT accepted some of the proposed conditions, but it stated that it did not agree to "attaching [Plain Avenue Storage's] letter to the change order." (Ex. 1106). It further stated that "[t]he fee & OH are in accordance with the contract documents" and that BRT "agreed . . . to a one time General conditions credit to help move the project along." (*Id.*). BRT also rejected Plain Avenue Storage's proposed condition concerning billing general conditions because, according to BRT, the parties "agreed at the beginning and invoiced on the first two req's that BRT would invoice 12 equal payments & bank inspector also agreed." (Ex. 1107, at 3). It stated that "BRT offered to waive [its] General Conditions for CO #3R being a good partner" but would not accept waiving general conditions in the future. (*Id.* at 2).

16

62.     Plain Avenue Storage understood BRT's response to be a rejection of its proposal. (Tr. 7:57).

63.     On September 9, 2016, Henry emailed Wallace stating that Plain Avenue Storage was "still reviewing [his] response to Change Order #3" and that Henry had not completed his analysis of Change Order #4.  (Ex. 110.23).

64.     That same day, Wallace provided Plain Avenue Storage with a plan from JAG Engineering for a new foundation wall on the south side of the project in further support of Change Order #4.  (Ex. 110.24).   A few days later, Wallace followed up with a further revised Change Order #4, including supporting documentation purportedly indicating that the original plan was to reuse the existing foundation for the south side of the project and that that plan was no longer feasible because the existing foundation did not satisfy the applicable building code. (Ex. 110.26).

### 3.     Pay Applications

65.     Article 5 and Exhibit D of the New Rochelle contract governed payments under the contract.  (Ex. 1026, at 7-11, 64-77).  Plain Avenue Storage was required to make progress payments based on applications for payment submitted by BRT.  (*Id.* at 7).

66.     Section 5.1.8 detailed the documents that must be submitted with each pay application.  (*Id.* at 8).  Those documents included (1) various lien waivers for BRT and its subcontractors; (2) a sworn statement identifying, among other things, parties performing work, materials or services performed by those parties, and the amounts paid and/or due to parties providing materials or services; (3) any other forms reasonably required by Plain Avenue Storage or the title insurer "in order to insure an effective conditional waiver of mechanic and materialmen lien law"; and (4) the documentation identified in Exhibit D to the contract.  (*Id.*).

67.     Exhibit D detailed Plain Avenue Storage's "Pay Application Policies and

Procedures." (*Id.* at 65). It outlined the process that pay applications must follow and identified

several documents that must be submitted with pay applications. (*Id.* at 65-66). Those

documents included (1) a certified and notarized certificate and application for payment, (2) lien

waivers, (3) a sworn statement, (4) copies of the subcontractor invoices that substantiate the

requested payment, and (5) a "Direct Check Log." (*Id.*). Attached to Exhibit D were templates

of several documents that were required to be submitted. (*Id.* at 68-77).

68.     Exhibit D required that change orders that are included on pay applications be

preapproved: "If a change order is on a pay application that has not been pre-approved, it will

not be paid." (*Id.* at 66).

69.     Exhibit D stated that if there were a discrepancy between the contractual policies

concerning pay applications and those of the lender, the lender's policies control. (*Id.* at 65).

70.     BRT repeatedly failed to comply with the contractual requirements for submitting

pay applications for the New Rochelle project. Among other errors, BRT did not timely submit

pay applications; did not timely correct erroneous pay applications; submitted sworn statements

with accounting errors; failed to break out expenses properly; included change orders that had

not yet been approved; omitted supporting documentation, such as lien waivers; and overbilled

certain line items. (Exs. 1562-1564 (summaries of New Rochelle pay-application process)).

71.     Lori Radcliff served as Banner's Project Coordinator for the New Rochelle and

Malden projects. (Tr. 5:69-70). In that role, she was responsible for ensuring that BRT's pay

applications complied with the contractual requirements. (*Id.*). When BRT's pay applications

failed to do so, she worked with Wallace or Audrey Dreyfus, BRT's comptroller, to try to

resolve the outstanding issues. (Tr. 5:87-88). She described that process as "very difficult." (Tr.

5:69). According to Radcliff, when Banner requested corrected pay applications, there was

"always pushback, sometimes yelling," and refusals to comply by BRT.  (Tr. 5:129).[9]

72.     When BRT provided complete, accurate, and substantiated pay applications,

Banner in turn provided them to the relevant lender within one or two days.  (Tr. 5:80).

73.     BRT's repeated failures to comply with the pay-application requirements under

the contract caused significant delays in the New Rochelle project.  (Exs. 1562-1564).

### 4.     Dispute as to Timing of Payments

74.     As noted, the New Rochelle contract provided that progress payments would be

based on the percentage of completion for each portion of work, including general conditions,

overhead, and profit.  (Ex. 1026, at 10).

75.     Wallace and BRT nonetheless took the position that BRT was entitled to be paid

in equal one-twelfth increments for general conditions, overhead, and profit.  (Tr. 2:66-67).

They contended that Wallace and Henry orally agreed to modify the contract to pay BRT in

equal increments.  (*Id.*; Tr. 2:70).  Henry denied that any such agreement occurred.  (Tr. 6:132).

76.     Plain Avenue Storage paid BRT in one-twelfth increments for its general

conditions, overhead, and profit on the first two pay applications.  (Tr. 6:77).  Henry and Radcliff

testified that these incremental payments were an "oversight."  (*Id.*; Tr. 7:7).

### 5.     Subcontractor-Execution Requirement

77.     As noted, Exhibit D stated that if there were a discrepancy between the

contractual policies concerning pay applications and those of the lender, the lender's policies

controlled.  (Ex. 1026, at 65).

78.     The lender on the New Rochelle project, Fifth Third Bank, required that 60% of

---

[9] At trial, the Court heard credible, detailed testimony—backed by documentary evidence—from Radcliff and Banner's expert, Dr. Terence Rodgers, concerning BRT's repeated non-trivial errors when submitting pay applications for the New Rochelle and Malden projects.  (Tr. 5:86-142; Tr. 6:47-56; Tr. 8:79-88; Ex. 1539). Dreyfus, who served as BRT's point of contact on the pay applications, did not testify at trial.

the subcontracts on each project be executed before funding the project.  (Ex. 1035; Ex. 1407; Tr. 6:132).  According to Banner, that requirement minimizes the risks of unforeseen costs for the design-builder and the lender.  (Tr. 8:84-85).  Fifth Third Bank was also the lender on the Lynn project and imposed the same requirement during that project.  (Ex. 1019; Tr. 7:9-10).

79.    Plain Avenue Storage informed BRT that funding for the New Rochelle project was subject to the same requirement.  (Tr. 7:9; Ex. 1035, at 1; Ex. 1036, at 3; Ex. 1037, at 1). Throughout the projects, Radcliff repeatedly updated BRT on its progress towards satisfying the 60% requirement for the project.  (Tr. 5:84-85; Ex. 1063).

80.    Plain Avenue Storage could not submit pay applications to Fifth Third Bank until the 60% requirement was met.  (Tr. 5:86).

81.    BRT did not satisfy the 60% requirement for the New Rochelle project until July 8, 2016.  (Ex. 1078).

### 6.    Storage Structure Payments

82.    Storage Structures, Inc. is a Georgia-based metal-building subcontractor.  (Tr. 7:72).  It designs, supplies, and builds metal structures for self-storage buildings.  (Tr. 7:73). BRT used Storage Structures for design services and steel fabrication for the New Rochelle and Malden projects.  (Tr. 7:72).

### a.    Payment #1

83.    On April 22, 2015, Storage Structures sent BRT an invoice for $9,900 for "Progress Payment/Deposit/Structural Drawings."  (Ex. 1158, at 1).

84.    On May 20, 2015, BRT sent Banner an invoice that requested, among other things, $9,900 for Storage Structures materials, including "light gauge metal."  (Ex. 1160, at 1). The entire invoice totaled $19,900.  (*Id.*).

85.    On June 9, 2015, Banner issued a check to BRT for $19,900, which included

$9,900 for Storage Structures.  (*Id.* at 2).

86.     On June 29, 2015, BRT paid Storage Structures $9,900.  (Ex. 1161, at 1; Ex. 1412; Tr. 7:75).

### b.     Payment #2

87.     On July 14, 2015, Storage Structures sent BRT an invoice for $185,000 for design work and materials.  (Ex. 1162, at 1).

88.     On July 22, 2015, Heath Mulkey, an owner of Storage Structures, executed a certification, waiver of lien, and release of claims for the $185,000 payment.  (Ex. 1528, at 1). That waiver indicated that $9,900 had been previously paid to Storage Structures.  (*Id.*).

89.     On July 23, 2015, BRT sent Banner an invoice that requested, among other things, $185,000 for a "steel deposit" made to Storage Structures.  (Ex. 1163, at 1).  That invoice totaled $189,987.11.  (*Id.*).

90.     On July 27, 2015, Wallace executed a certification, waiver of lien, and release of claims for payment in the amount of $189,987.11, which included $185,000 for Storage Structures.  (Ex. 1529, at 2).

91.     On August 5, 2015, Banner issued a check to BRT for $189,987.11, which included $185,000 for Storage Structures.  (Ex. 1164, at 1).

92.     On August 7, 2015, a check for $189,987.11 was deposited into BRT's bank account.  (Ex. 1165, at 1).

93.     Storage Structures was not paid any portion of the $185,000 invoice.  (Tr. 7:75-77; Tr. 7:85).  Wallace admitted at trial that BRT did not pay Storage Structures the $185,000. (Tr. 3:9).  It also did not return $185,000 to Banner or credit Banner that amount, but instead kept the money for its own use.  (Tr. 6:64).  Storage Structures ultimately cancelled that invoice and did not pursue action to collect it.  (Ex. 1412, at 1).

94.     Wallace contends that BRT was entitled to the $185,000 as compensation for the $178,171 deductive change order that was executed as part of the settlement for the Lynn project.  (Tr. 4:14; Ex. 1495, at 2).[10]

**c.     Payment #3**

95.     On October 9, 2015, Storage Structures sent BRT an invoice for $30,000 for a deposit. (Ex. 1166, at 1).

96.     On October 19, 2015, Chris Pearson, an owner of Storage Structures, executed a certification, waiver of lien, and release of claims for $30,000.  (Ex. 1530).  That waiver indicated that $194,900 had been previously paid to Storage Structures.  (*Id.*).  That statement was false.

97.     On December 7, 2015, BRT sent Banner an invoice that requested, among other things, $30,000 for a "metal siding deposit."  (Ex. 1167, at 1).  That invoice totaled $99,603.  (*Id.*).

98.     On January 6, 2016, BRT paid $30,000 to Storage Structures.  (Ex. 1169, at 1; Tr. 7:82; Ex. 1412).

99.     On January 26, 2016, Banner issued a check to BRT for $99,603, which included $30,000 for the metal siding deposit.  (Ex. 1168, at 1).

100.     On July 18, 2016, Mulkey executed a waiver of lien, which acknowledged receipt of $224,900 and released any claims against the New Rochelle property.  (Ex. 1170, at 1).[11]

---

[10] In an interrogatory response, which was admitted into evidence at trial, Wallace stated that part of the $185,000 was paid to two subcontractors that were still owed money following the Lynn project.  (Ex. 1495, at 2-3).

[11] Mulkey testified at trial that he understood the waiver as "just part of the paper process that [Storage Structures] had to do to submit to get payment. . . .  It was just part of the paperwork that the title company had where they were back and forth with paperwork to submit the invoice and get pay to [Storage Structures]."  (Tr. 7:77-78).  He further testified that he signed that waiver at Wallace's request.  (Tr. 7:78).

101.    BRT and Wallace knowingly submitted sworn statements, pay applications, and invoices to Plain Avenue Storage that indicated that BRT paid $224,900 to Storage Structures. (Tr. 5:96; Ex. 107.9; Tr. 5:114-15; Ex. 1094; Tr. 7:66-67; Exs. 1111; 107.17, 107.18; Exs. 1160, 1163, 1167).  In fact, BRT paid only $39,900 to Storage Structures.   (Ex. 1161, at 1; Ex. 1412; Tr. 7:75; Tr. 7:82).

102.    Those sworn statements were false and were made by Wallace for the purpose of obtaining additional funds from Plain Avenue Storage to which BRT was not contractually entitled.

### 7.    Contract Termination

103.    On September 13, 2016, Henry informed Wallace by phone that Plain Avenue Storage was terminating BRT as general contractor for the New Rochelle project.  (Tr. 7:57-58; Ex. 1113).  He further informed him that BRT would remain the general contractor for the Malden project because he believed that Wallace could perform when focused on a single project to which he was more closely located geographically.  (*Id.*).

104.    On September 15, 2016, BRT send a demand for mediation concerning claims arising out of the New Rochelle contract.  (Ex. 112, at 2).  That mediation was ultimately held in December 2016.  (Tr. 4:111-12).

105.    On September 21, 2016, Plain Avenue Storage sent Wallace a letter stating that it was terminating the New Rochelle contract for cause.  (Ex. 1108).  That letter further stated that BRT had "repeatedly failed to supply enough properly skilled workers and proper materials to advance [the New Rochelle project]."  (*Id.* at 1).  It further stated that BRT was "in breach of several provisions" of the New Rochelle contract, including:

1.  Design-Builder has failed to keep the Project on schedule.  The Project is now more than 80 days behind schedule.

2. Design-Builder failed to have a superintendent on site overseeing the project on several occasions, specifically four out of five times when Bill Henry visited the site unannounced.

3. Pay applications have been incorrect in material respects during the entirety of the Project. Specifically, Design Builder has overbilled on general conditions, overhead and profit and continues to request payment on these items after being told not to.

4. The Construction Schedule has not been updated in months after repeated requests for the same from the Project Manager, Rick Henry.

(*Id.*). It stated that termination was effective as of September 29, 2016. (*Id.* at 2).

106. On September 26, 2016, Wallace responded to the Plain Avenue Storage termination letter on behalf of BRT. (Ex. 1109). He stated that he was "shocked and bewildered at the termination for cause, because during [the parties'] call on September 13, 2016 with Bill Henry[,] Bill informed [BRT] that the termination was for convenience." (*Id.* at 1). He further stated that Plain Avenue Storage was "in breach of several provisions of the contract" and that the project has had "many Owner related delays starting with the Construction Start date, closing dates, Payments from December to July, IDA paperwork, Concealed & unknown conditions uncovered during demolition, Owner CO's delays, and unsuitable soil conditions." (*Id.*). The letter also specifically responded to, and denied, Plain Avenue Storage's statements concerning the site superintendent, pay-application process, and construction schedule. (*Id.* at 1-2). It concluded that BRT "disputes that [it] has been in material breach of the agreement" but that "if there [were] any steps [it could] take to cure any such alleged breaches[,] [it] would be happy to do so." (*Id.* at 2).

107. After terminating BRT, Plain Avenue Storage hired ARCO Murray to complete the New Rochelle project. (Ex. 1575).

### E.   The Malden Project

#### 1.   Progress of Work

108.    As with the New Rochelle project, before the execution of the contract, BRT entered into oral contracts with KOH Architecture, JAG Engineering, and other subcontractors to perform certain design services for the Malden project.  (Tr. 1:56-57).  They performed that work and were paid in full.  (Tr. 2:29-30).  BRT invoiced Malden Storage for that work.  (Tr. 2:29).

109.    The Notice to Proceed was issued on June 6, 2016.  (Ex. 1183, at 3).

110.    As part of the plan for the Malden project, BRT proposed crushing and recycling the existing materials on site, rather than removing debris and bringing in fill, as a cost-saving mechanism.  (Tr. 7:121).  The geotechnical consultant agreed with that recommendation.  (*Id.*).  BRT informed Banner that "this will result in a savings of potential change orders from $70-80,000 if [it were] able to use the crushed masonry products from the demolition of [the] building."  (Ex. 1398, at 2).

111.    To perform the on-site crushing, BRT was required to obtain a permit from the City of Malden.  (Ex. 1398, at 2).  It failed to do so in a timely manner.  BRT did not request that Malden Storage draft a letter, presumably to Malden city officials, stating that BRT has Malden Storage's permission to request such a permit until June 23, 2016.  (*Id.* at 1-2).[12]  Banner provided that letter on June 27.  (*Id.* at 1).

112.    The crushing process, including the failure to timely obtain the necessary permit, delayed the project approximately 45 days.  (Ex. 1523).  Banner estimates that crushing increased project costs by approximately $57,000.  (Ex. 1523, at 1).

---

[12] Wallace stated that the relevant city ordinance was not in place at the time of the contract or not "easy to find," but Banner was able to find the ordinance the same afternoon it became aware of the requirement.  (Tr. 7:120-21).

### 2.   **Change Order #2**

113.    On October 7, 2016, after BRT obtained the permit, it submitted Change Order #2 to Malden Storage for reimbursement of related costs.  (Ex. 211.1, at 1).  The costs included, among other things, the permit cost, attorneys' fees, and the cost for a fire watch for the two-week period when the site was shut down because BRT did not have the permit.  (*Id.* at 2).  In total, the change order requested that the Guaranteed Maximum Price of the contract be increased by $56,342.76 and that the contract time be increased by 21 days.  (*Id.* at 2).

114.    Over the next three months, BRT and Malden Storage went back and forth concerning Change Order #2.  BRT would regularly ask for status updates, and Malden Storage would either provide updates or request that BRT submit further supporting documentation. (*See, e.g.*, Ex. 211.2 (November 10, 2016 e-mail from BRT); Ex. 211.3 (November 10, 2016 e-mail from Rick Henry); Ex. 211.4 (November 11, 2016 e-mail from BRT); Ex. 213 (November 16, 2016 e-mail from Rick Henry); Ex. 217.1 (November 18, 2016 e-mail from Rick Henry); Ex. 217.2 (November 30, 2016 e-mail from BRT with additional documentation); Ex. 218 (December 2, 2016 e-mail from BRT requesting update); Ex. 219.1 (December 2, 2016 e-mail from Rick Henry)).

115.    On December 20, 2016, Malden Storage approved all of Change Order #2 except for one week of the fire watch.  (Ex. 222).  It stated that that portion of the fire watch occurred during the demolition phase of the project, which was BRT's responsibility.  (Ex. 211.3).

### 3.   **Pay Applications**

116.    The Malden contract included the same provisions and exhibits as the New Rochelle contract concerning progress payments by Malden Storage and applications for

payment by BRT.  (Ex. 1182, at 7-11, 55-68).[13]

117.    As with the New Rochelle contract, BRT repeatedly failed to comply with the contractual requirements for submitting pay applications for the Malden project.  Among other errors, BRT did not timely submit pay applications; did not timely correct erroneous pay applications; submitted sworn statements with accounting errors; failed to properly breakout expenses; included change orders that were not yet approved; omitted supporting documentation, such as lien waivers; overbilled certain line items; and improperly filed a false lien against the property.  (Exs. 1565-69 (summaries of Malden pay-application process)).

118.    BRT's repeated failures to comply with the pay-application requirements under the contract caused significant delays in the Malden project.  (*Id.*).

### 4.    Dispute as to Timing of Payments

119.    As noted, the Malden contract provided that progress payments would be based on the percentage of completion for each portion of work, including general conditions, overhead, and profit.  (Ex. 1182, at 10).

120.    Wallace and BRT nonetheless took the position that BRT was entitled to be paid in equal one-eleventh increments for general conditions, overhead, and profit.  (Tr. 2:66-67).  They contended that Wallace and Henry orally agreed to modify the contract to pay BRT in equal increments.  (*Id.*; Tr. 2:70).  Henry denied that any such agreement occurred.  (Tr. 6:132).

### 5.    Subcontractor-Execution Requirement

121.    The lender on the Malden project, Fifth Third Bank, was the same as that on the New Rochelle project.  (Ex. 1035; Ex. 1407; Tr. 6:132).  As with the New Rochelle project, it

---

[13] Exhibit D to the New Rochelle contract was updated on October 21, 2015.  (Ex. 1026, at 65).  Exhibit D to the Malden contract was updated on January 18, 2016.  (Ex. 1182, at 56).  They are the same for all purposes material to the present dispute.

required that 60% of the subcontracts on each project be executed before funding the projects. (*Id.*).  Malden Storage could not submit pay applications to Fifth Third Bank until the 60% requirement was met.  (Tr. 5:86).

122.    BRT did not satisfy the 60% requirement for the Malden project until July 6, 2016.  (Ex. 1228).

### 6.    Storage Structure Payments

123.    On October 8, 2015, Storage Structures sent BRT an invoice for $165,000 for "Progress Payment/Deposit/Structural Drawings."  (Ex. 1410, at 1).

124.    The next day, BRT sent Banner an invoice that requested, among other things, $165,000 to be paid to Storage Structures.  (Ex. 1193, at 1).  That invoice totaled $212,000. (*Id.*).

125.    On October 14, 2015, Chris Pearson of Storage Structures executed a certification, waiver of lien, and release of claims for $165,000.  (Ex. 1203, at 1).

126.    On October 21, 2015, Banner issued a check to BRT for $212,000, which included $165,000 for Storage Structures.  (Ex. 1194, at 1).

127.    On October 26, 2015, BRT deposited that check into its bank account.  (Tr. 3:19-20; Ex. 1195, at 1).

128.    The following month, on November 24, 2015, Mulkey of Storage Structures e-mailed Wallace concerning the payments that BRT owed Storage Structures for the New Rochelle and Malden projects.  (Ex. 1196, at 1).  After receiving no response, Mulkey followed up on November 30.  (*Id.*).

129.    Nearly seven months later, on June 14, 2016, BRT issued a check to Storage Structures for $22,718.  (Ex. 1198, at 1).  That check bounced due to insufficient funds.  (Ex. 1202; Ex. 1197; Tr. 7:83).

130.    On July 21, 2016, Mulkey informed Wallace that the check bounced.  (Ex. 1197, at 1).  Wallace replied, apologizing to Mulkey and stating that he had not been paid since December 2015.  (Ex. 1199).  That same day, BRT issued another check to Storage Structures for $22,718 and a check for $30 to cover the insufficient funds bank charge.  (Exs. 1200-01).

131.    BRT did not pay Storage Structures the remaining $142,282 of the $165,000 invoice.  (Tr. 3:19; Tr. 7:82).  It did not return the $142,282 to Banner or credit Banner that amount, but instead kept the money for its own use.  (Tr. 6:67).

132.    Wallace contends that BRT was entitled to $142,000 as compensation for the punch-list work that BRT completed on the Lynn project.  (Ex. 1495, at 3).

133.    BRT and Wallace repeatedly submitted knowingly submitted sworn statements, pay applications, and an invoice to Malden Storage that represented that BRT had paid $165,000 to Storage Structures for preconstruction expenses for the Malden project.  (Exs. 207.1; 208.1; 209.1; 1193).  In fact, it paid only $22,718 to Storage Structures.  (Ex. 1200).

134.    Those sworn statements were false and were made by Wallace for the purpose of obtaining additional funds from Malden Storage to which BRT was not contractually entitled.

### 7.    Contract Termination

135.    On January 3, 2017, BRT sent a letter to Malden Storage stating that it was "exercising it's [sic] rights under the executed contract" and providing "notice that BRT [would] suspend work in accordance with the contract provisions for failure of the Owner to make payments monthly and with holding [sic] in excess of $250,000.00."  (Ex. 232, at 2).  It requested that Malden Storage "remit all funds in requisition 5 by January 9, 2017 5 PM EST." (*Id.*).  If the funds were not received by that date, "[w]ork on-site would be suspended in seven days on January 10, 2017."  (*Id.*).

136.    That same day, BRT filed the present lawsuit.  (Compl. at 1).  The parties did not

mediate claims arising out of the Malden project at any time before BRT sued Malden Storage. (Tr. 4:111-12).[14]

137.    The following day, Malden Storage informed BRT that it would "adjust the requisitions and submit them to the bank for payment." (Ex. 233, at 1).

138.    On January 6, 2017, Malden Storage provided a formal response to BRT's suspension letter. (Ex. 234.1). It detailed the timeline associated with Pay Application #5, including the fact that Malden Storage had "not received a signed final [Pay Application #5] revised per Rick Henry's email dated December 2, 2016 . . . ." (*Id.* at 2). It stated that it would "submit the signed Pencil Draw (with [Malden Storage's] reductions as set forth in Exhibit A attached hereto) . . . to Fifth Third Bank for payment." (*Id.*).[15] It further stated that moving forward, BRT nonetheless had to comply with the contractual provisions governing pay applications. (*Id.*).

139.    On January 23, 2017, four months after Plain Avenue Storage terminated the New Rochelle contract, Malden Storage sent BRT a letter stating that it was terminating the Malden contract for cause. (Ex. 1317). That letter further stated that BRT was "in breach of several provisions of the Design-Build Documents," including:

1.    Design-Builder has failed to submit Applications for Payment in accordance with Section A.5.1.3 of the Contract.

2.    Design-Builder has filed liens against the property for non-payment, even though he has failed to follow the procedures for Applications for Payment set

---

[14] Wallace initially testified that the parties "discussed," "talked about," and "spoke about" Malden at the December 2016 mediation. (Tr. 2:22-23; Tr. 4:111-12). He later conceded, however, that "it was a mediation about New Rochelle, not Malden." (Tr. 4:112; *see also id.* ("[I]t was for New Rochelle . . . . I believe the notice was for just New Rochelle . . . .")).

[15] A "pencil draw" is "a quick representation of the pay [application] that's reviewed between the project manager, the general contractor and the inspecting architect." (Tr. 5:70). A pencil draw "can be sometimes just two pages long," where a pay application "can be hundreds of pages." (*Id.*).

forth in Section A.5.1.3 of the Contract.

3. Design-Builder has suspended work without the right to do so, which such stoppage will materially damage the project.

4. Pay applications have been incorrect in material respects during the entirety of the Project. Specifically, Design-Builder has overbilled on stored materials, general conditions, overhead and profit and continues to request payment on these items after being told not to.

5. Design Builder has breached Section A.4.3.1 of the Contract which required that all claims arising under the Contract be submitted to "mediation as a condition precedent to arbitration or the institution of legal or equitable or other binding dispute resolution proceedings by either party."

(*Id.* at 1-2).

140.    The next day, BRT responded.  (Ex. 236).  It stated that "the purported termination is wrongful and that all of the grounds for same as alleged in [Malden Storage's] letter are false and are categorically denied."  (*Id.* at 2).  It further stated that it would amend the complaint in this action to include a count for wrongful termination of the Malden contract. (*Id.*).

141.    Between January 27 and February 6, 2017, BRT and Malden Storage negotiated transition of the Malden project.  (*See, e.g.*, Ex. 237; Ex. 239; Ex. 240).  Eventually, Malden Storage hired ARCO Murray to complete the project.  (Ex. 1576).

142.    On February 1, 2017, Newbanks, a construction consulting firm, completed a monthly site observation report for Fifth Third Bank.  (Ex. 238).  It concluded that the Malden project was "approximately 55% complete including offsite stored structural steel materials." (*Id.*).

### F.    Post-Termination Cooperation of BRT Subcontractors

143.    The New Rochelle and Malden contracts provided that BRT's design professionals were obligated to convey a non-exclusive license to their drawings, specifications,

and related documents if the contracts were terminated under certain circumstances:

> If this Agreement is terminated for any reason other than the default of the Owner, or termination for convenience . . . , each of the Design-Builder's design professionals, including the Architect, shall be contractually required to convey to the Owner a non-exclusive license to use that design professional's Instruments of Service for the completion, use and maintenance of the Project, conditioned upon the Owner's written notice to that design professional . . . and payment to that design professional of all amounts due to that design professional and its consultants.

(Ex. 1026, at 26; Ex. 1182, at 20).  The contracts further provided that BRT was required to incorporate that requirement in all agreements with its design professionals.  (*Id.*).

144.    As noted, the design professionals used by BRT for the New Rochelle and Malden projects include KOH Architecture and JAG Engineering.  (Tr. 8:41).

145.    BRT did not include a provision concerning the non-exclusive license in any contract with its subcontractors.  (*Id.*).

146.    After termination of the New Rochelle contract, Wallace sent letters to several subcontractors, including KOH Architecture, notifying them of Plain Avenue Storage's termination of the contract.  (Ex. 1542).  The letters stated, among other things, "[p]lease do not talk with the owner or its representatives at this time until this is resolved."  (*Id.* at 2).[16]

147.    Banner provided written notice to KOH Architecture and JAG Engineering that it was assuming BRT's contractual duties and obligations after it terminated the New Rochelle and Malden projects.  (Tr. 8:41; Tr: 8:44).  KOH Architecture and JAG Engineering, however, refused to communicate with Banner or provide it with any materials that they had created thus

---

[16] Exhibit 1542 includes letters that are identical in substance and sent to eleven subcontractors, including one to KOH Architecture. (Ex. 1542, at 2).  The letters appear to concern the termination of the New Rochelle contract, in light of the September 29, 2016 effective date referred to in the letters.  (*Id.*).  It is unclear whether similar letters were sent following the termination of the Malden contract.  Furthermore, Exhibit 1542 does not include a letter to JAG Engineering, but Henry testified that it was sent a similar letter.  (Tr. 8:43-44).

far for the projects.  (Tr. 8:40-44).[17]

148.    As a result of the subcontractors' refusal to work with Banner after the

termination of the contracts, Banner was required to hire new design professionals, including an

architect and multiple engineering firms.  (Tr. 8:42-44; Ex. 1033 (New Rochelle project damages

summary); Ex. 1189 (Malden project damages summary)).

## III.    **Procedural Background**

149.    On January 3, 2017, BRT filed this action against Malden Storage, Plain Avenue

Storage, and Banner Drive Storage.  The complaint asserts eight claims.  Counts 1 through 6

allege parallel common-law claims for breach of contract, quantum meruit and unjust

enrichment, and breach of the implied covenant of good faith and fair dealing, respectively,

against Plain Avenue Storage (Counts 1, 2, and 3) and Malden Storage (Counts 4, 5, and 6).

Counts 7 and 8 are claims only against Malden Storage for violations of Mass. Gen. Laws ch.

149, § 29E, concerning construction contracts (Count 7), and for unfair and deceptive trade

practices under Mass. Gen. Laws ch. 93A, § 11 (Count 8).[18]

150.    On March 7, 2017, Plain Avenue Storage and Malden Storage counterclaimed

against BRT and filed a third-party complaint against Wallace.  On March 24, they jointly filed

an amended counterclaim against BRT and an amended third-party complaint against Wallace.

151.    The amended counterclaim asserts claims for breach of contract, breach of the

implied covenant of good faith and fair dealing, conversion, tortious interference with

advantageous relations, and fraud by Plain Avenue Storage (Counts 1 through 5) and by Malden

---

[17] Henry testified that KOH Architecture provided Banner architectural drawings.  (Tr. 8:42-43).  They were provided, however, in PDF format, which are not able to be manipulated, rather than in CAD format, as Banner requested.  (*Id.*).

[18] Count 8 was also asserted against Banner.

Storage (Counts 7 through 11).  The amended counterclaim also asserts state-law statutory

claims against BRT for deceptive business acts and practices under N.Y. Gen. Bus. Law § 349

(Count 6), and for unfair and deceptive trade practices under Mass. Gen. Laws ch. 93A, § 11

(Count 12).[19]

152.    The amended third-party complaint alleges claims against Wallace for

conversion, tortious interference with advantageous relations, and fraud, respectively, by Plain

Avenue Storage (Counts 3, 4, and 5) and by Malden Storage (Counts 9, 10, and 11).

153.    On August 7, 2017, the Court granted an assented-to motion to dismiss Banner

from the litigation.

154.    The matter was tried to the Court without a jury between April 26 and May 6,

2021.

## IV.    **Conclusions of Law**

### A.    **Breach of Contract**

#### 1.    **New York – Count 1 (BRT v. Plain Avenue Storage) and Counterclaim 1 (Plain Avenue Storage v. BRT)**

155.    Under New York law, to prove a claim for breach of contract, a plaintiff must

show (1) the formation of a contract, (2) performance under that contract by plaintiff, (3) breach

of that contract by defendant, and (4) resulting damage.  *See McCormick v. Favreau*, 919

N.Y.S.2d 572, 577 (2011).

156.    A material breach is "one which would justify the other party to suspend his own

performance, or a breach which is so substantial as to defeat the purpose of the entire

transaction." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976) (citations

---

[19] The parties do not appear to dispute that Massachusetts law applies to the claims arising out of the Malden project, and that New York law applies to the claims arising out of the New Rochelle project.

omitted).  Whether a breach qualifies as material "turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016).

157.    "[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Id.*  However, "[i]f the party in default has substantially performed, the other party's performance is not excused." *Hadden v. Consol. Edison Co. of New York*, 34 N.Y.2d 88, 96 (1974).

158.    "A partial breach may entitle the non-breaching party to damages for the breach, but does not entitle the party to simply treat the contract as at an end.  A partial breach by one party does not justify the other party's subsequent failure to perform; both parties may be guilty of breaches, each having a right to damages." *Process Am.*, 839 F.3d at 136 (citing *Lovink v. Guilford Mills, Inc.*, 878 F.2d 584, 586 (2d Cir. 1989)) (internal citation, quotations marks, and alteration omitted).

159.    Failure to make construction progress payments as they become due constitutes a material breach of a construction contract.  *See U.W. Marx, Inc. v. Koko Contr., Inc.*, 2 N.Y.S.3d 276, 278 (2015) (concluding that plaintiff "had materially breached the contract by failing to make three successive progress payments that [the defendant] was entitled to receive"); *Serena Const. Corp. v. Valley Drywall Serv., Inc.*, 357 N.Y.S.2d 214, 215 (1974) ("The failure of plaintiff to make a progress payment when due constituted a breach of the agreement between the parties . . . .").

2.   **Massachusetts – Count 4 (BRT v. Malden Storage) and Counterclaim 7 (Malden Storage v. BRT)**

160.   To prove a breach of contract under Massachusetts law, a plaintiff must show that "there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 316 (D. Mass. 1997); *accord Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999).

161.   The elements of a valid contract include an offer, an acceptance, and an exchange of consideration. *See Harbi v. Massachusetts Inst. of Tech.*, 2017 WL 3841483, at *7 (D. Mass. Sept. 1, 2017) (citing *Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass. 2009)).

162.   "A material breach by one party excuses the other party from further performance under the contract." *Verderber v. Perry*, 1999 WL 525953, at *3 (1st Cir. Mar. 8, 1999) (quoting *Ward v. American Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100 (1983)). Such a breach occurs when it concerns "an essential and inducing feature of the contract." *G4S Tech. LLC v. Massachusetts Tech. Park Corp.*, 479 Mass. 721, 733-34 (2018). "[E]ssential and inducing" features include those "provisions that are so serious and so intimately connected with the substance of the contract that a failure to uphold the provision would justify the other party walking away from the contract and no longer being bound by it." *Id.* (internal quotation marks, citation, and alteration omitted).

163.   "Once relieved from performance, the injured party is not liable for further damages incurred by the party in material breach." *See Lease-It v. Massachusetts Port Authority*, 33 Mass. App. Ct. 391, 396-97 (1992).

### 3.   **Conclusion**

164.   The New Rochelle contract was a valid and enforceable contract between Plain Avenue Storage and BRT.

165.   Plain Avenue Storage substantially performed under that contract.  Among other things, it timely processed pay applications when such applications were complete and accurate, and reviewed, negotiated, and—when appropriate—approved change orders in accordance with the terms of the contract.

166.   Plain Avenue Storage did not breach the New Rochelle contract when it failed to approve Change Orders #3 and #4.  Even assuming that the condition of the soil and the foundation were materially different from what was identified in the original design-build documents, and even assuming that BRT satisfied its obligation under the contract to timely raise the issues with Plain Avenue Storage, Plain Avenue Storage "investigate[d]" the purportedly unknown conditions and "negotiate[d]" with BRT an equitable adjustment.  (*See* Ex. 1026, at 35).

167.   For example, during the second half of August 2016, BRT and Plain Avenue Storage went back and forth concerning potential change orders related to the subsurface conditions.  (*See, e.g.*, Tr. 7:40-55; Exs. 110.8, 110.9, 110.10, 110.13. 110.14, 110.16, 110.22, 110.23, 110.24, 110.26).  Plain Avenue Storage repeatedly reviewed the proposed change orders and supporting documentation, such as the contract documents and geotechnical reports and visited the site multiple times to review the ground conditions.  (Tr. 7:41-42).  It requested that BRT submit specific supporting documentation in support of the potential change orders.  (Ex. 1133).  And it ultimately offered to conditionally accept Change Order #3 and the rigid-inclusion work in Change Order #4, even though it "deem[ed] 90% of the Rigid Inclusion work [to be] contract work and . . . BRT's responsibility."  (Ex. 110.14, at 2).  By investigating and

negotiating in good faith, Plain Avenue Storage fulfilled its obligation under the contract.[20]

168.     Furthermore, the New Rochelle contract was not orally modified by Wallace and Henry to provide that general conditions on the New Rochelle project would be paid in monthly increments.  The contract does not allow for oral modifications.  (Ex. 1026, at 2).  Henry and Radcliff credibly testified that no such agreement was made and that Plain Avenue Storage's initial monthly payments were an "oversight."  (Tr. 6:132; Tr. 6:77; Tr. 7:7).

169.     BRT materially breached the New Rochelle contract by, among other things, failing to timely complete work, including delays resulting from failing to timely obtain permits and failing to staff and equip the New Rochelle site; failing to timely and accurately complete pay applications; failing to comply with requirements of the lender that were integrated into the New Rochelle contract; failing to pay Storage Structures when it received funds from Plain Avenue Storage for work completed by Storage Structures; and failing to require its design subcontractors to convey a non-exclusive license to Plain Avenue Storage to use their drawings and related documents.

170.     Plain Avenue Storage was damaged, among other ways, in the form of increased costs for completion of the New Rochelle project, as further described below, because of BRT's breach of contract.

171.     Accordingly, as to the New Rochelle contract, BRT is liable for breach of contract, and Plain Avenue Storage is not liable for breach of contract.

---

[20] In fact, it is likely that Plain Avenue Storage was not even under an obligation to negotiate an equitable adjustment to the contract with BRT, in light of its initial conclusion that the third Whitestone report did not reveal previously unknown conditions related to the soil or foundation.  (Ex. 110.3, at 1).  The New Rochelle contract provides that "[i]f the Owner determines that the conditions at the site are not materially different from those indicated in the Design-Build Documents and that no change in the terms of the Design-Build Contract is justified, the Owner shall so notify the Design-Builder in writing, stating the reasons."  (Ex. 1026, at 35).  In any event, Plain Avenue Storage ultimately negotiated in good faith with BRT.

172.    Likewise, the Malden contract was a valid and enforceable contract between Malden Storage and BRT.

173.    Malden Storage substantially performed under that contract.  Among other things, it timely processed pay applications when such applications were complete and accurate; reviewed, negotiated, and—when appropriate—approved change orders in accordance with the terms of the contract; and complied with Mass. Gen. Laws ch. 149, § 29E.

174.    Like the New Rochelle contract, the Malden contract was not orally modified by Wallace and Henry to provide that general conditions on the Malden project would be paid in monthly increments.

175.    BRT materially breached that contract by, among other things, failing to timely complete work, including delays resulting from failing to timely obtain the necessary permits; failing to timely and accurately complete pay applications; failing to comply with requirements of the lender that were integrated into the Malden contract; failing to pay Storage Structures when it received funds from Malden Storage for work completed by Storage Structures; failing to require its design subcontractors to convey a non-exclusive license to Malden Storage to use their drawings and related documents; and failing to mediate disputes arising from the contract before filing the present lawsuit.

176.    Malden Storage was damaged, among other ways, in the form of increased costs for completion of the Malden project, as further described below, because of BRT's breach of contract.

177.    Accordingly, as to the Malden contract, BRT is liable for breach of contract, and Malden Storage is not liable for breach of contract.

### B.    Quantum Meruit and Unjust Enrichment

### 1.    New York – Count 2 (BRT v. Plain Avenue Storage)

178.    Under New York law, quantum meruit and unjust enrichment are analyzed "together as a single quasi contract claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).

179.    For a plaintiff to recover under a theory of quantum meruit or unjust enrichment, he must show "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.* (quoting *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 69 (2d Cir. 2000)).

180.    A plaintiff cannot recover on a theory of quantum meruit or unjust enrichment "if the parties have a valid, enforceable contract that governs the same subject matter." *Id.* (citing *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 388 (1987); *Ellis v. Abbey & Ellis*, 742 N.Y.S.2d 225, 228 (1st Dep't 2002); *Mariacher Contracting Co., Inc. v. Kirst Constr., Inc.*, 590 N.Y.S.2d 613, 615 (4th Dep't 1992)).

### 2.    Massachusetts – Count 5 (BRT v. Malden Storage)

181.    Under Massachusetts law, claims for quantum meruit and unjust enrichment are treated similarly and have the same elements. *See Scarpaci v. Lowe's Home Ctr., LLC*, 212 F. Supp. 3d 246, 253 n.8 (D. Mass. 2016) (quoting *SAR Grp. Ltd. v. E.A. Dion, Inc.*, 79 Mass. App. Ct. 1123 (2011)).

182.    For a plaintiff to recover on a theory of quantum meruit or unjust enrichment, he must show "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances [that] would be inequitable without payment for its value."

40

*Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009); *see also Finard & Co. v. Sitt Asset Mgmt.*, 79 Mass. App. Ct. 226, 229 (2011).

183.    A plaintiff cannot recover on a theory of quantum meruit or unjust enrichment "where there is a valid contract that defines the obligations of the parties." *Boston Med. Ctr. Corp. v. Secretary of Exec. Off. of Health & Human Servs.*, 463 Mass. 447, 467 (2012) (citing *York v. Zurich Scudder Invs., Inc.*, 66 Mass. App. Ct. 610, 620 (2006)); *see also Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 130 (1st Cir. 2006) ("Massachusetts law does not allow litigants to override an express contract by arguing unjust enrichment.").

### 3.    Conclusion

184.    As noted, the New Rochelle contract was an enforceable contract that defined the obligations of BRT and Plain Avenue Storage as to the New Rochelle project, and the Malden contract was likewise an enforceable contract that defined the obligations of BRT and Malden Storage as to the Malden project.

185.    Accordingly, BRT may not recover on a theory of quantum meruit or unjust enrichment for any benefit purportedly conferred on Plain Avenue Storage during the New Rochelle project or on Malden Storage during the Malden project.

### C.    Breach of the Implied Covenant of Good Faith and Fair Dealing

### 1.    New York – Count 3 (BRT v. Plain Avenue Storage) and Counterclaim 2 (Plain Avenue Storage v. BRT)

186.    Under New York law, "all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002) (collecting cases).

187.    That covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of

the contract," *id.* (internal quotation marks omitted), and "[e]ncompass[es] . . . 'any promises which a reasonable person in the position of the promise would be justified in understanding were included.'" *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (1978)).  It does not extend, however, to obligations that are "inconsistent with other terms of the contractual relationship." *Id.* (quoting *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 304 (1983)).

188.    Under New York law, the elements of a claim for breach of the implied duty of good faith and fair dealing are "(1) defendant must owe plaintiff a duty to act in good faith and conduct fair dealing; (2) defendant must breach that duty; and (3) the breach of duty must proximately cause plaintiff's damages." *Washington v. Kellwood Co.*, 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009) (quoting *Boyd v. University of Illinois*, 2001 WL 246402, at *10 (S.D.N.Y. Mar. 13, 2001)).

189.    "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when it is based on the same facts as the breach of contract claim." *Goldblatt v. Englander Comms., LLC*, 2007 WL 148699, at *5 (S.D.N.Y. Jan. 22, 2007) (citing *Harris v. Provident Life & Accident Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002); *Ari & Co. v. Regent Int'l Corp.,* 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003)).[21]  For such a claim to be viable, plaintiff must establish "a legal duty separate and apart from contractual duties." *Washington*, 2009 WL 855652, at *6 (citing *Goldblatt*, 2007 WL 148699, at *5).

---

[21] New York law similarly does not recognize a separate cause of action for breach of the implied covenant when "the relief sought in claiming a breach of the implied covenant of good faith is intrinsically tied to the damages allegedly resulting from the breach of contract." *Goldblatt*, 2007 WL 148699, at *5 (citing *Alter v. Bogorician*, 1997 WL 691332, at *8 (S.D.N.Y. Nov. 6, 1997)).

2. **Massachusetts – Count 6 (BRT v. Malden Storage) and Counterclaim 8 (Malden Storage v. BRT)**

190.    Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.  *See UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  That covenant "concerns the manner of performance" of the contract.  *Id.* (citing *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200, 211 (1993)).  It provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."  *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471-72 (1991) (quoting *Drucker v. Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976)).

191.    By contracting, parties implicitly agree "to deal honestly and in good faith in both the performance and enforcement of the terms of their contract."  *Hawthorne's*, 414 Mass. at 211.  The scope of the covenant is only as broad as the contract between the parties, and the implied covenant does "not create rights or duties beyond those the parties agreed to when they entered into the contract."  *Curtis v. Herb Chambers I-95, Inc.,* 458 Mass. 674, 680 (2011); *see also Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005).

192.    To establish a breach of the implied covenant, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract."  *FabriClear, LLC v. Harvest Direct, LLC*, 481 F. Supp. 3d 27, 35 (D. Mass. 2020) (quoting *Blake v. Professional Coin Grading Serv.*, 898 F. Supp. 2d 365, 388 (D. Mass. 2012)).

193.    Typically, "a breach of the implied covenant involves 'bad faith' conduct implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of the fraud."  *Targus Group Int'l, Inc. v. Sherman*, 76 Mass. App. Ct. 421, 435 (2010) (internal quotation

43

marks omitted).

### D.   Conclusion

194.    In connection with the New Rochelle and the Malden contracts, the parties owed

one another a duty to act in good faith and fair dealing during the performance of those contracts.

195.    Plain Avenue Storage and Malden Storage did not identify the factual basis for

their counterclaims for breach of the implied covenant in their initial pleadings or in their post-

trial briefing.  At trial, counsel indicated that the counterclaims are "very closely connected

to . . . the fraudulent behavior and also the conversion."  (Tr. 9:18-19).  But counsel did not

explain how those facts support a distinct claim for breach of the implied covenant.  Nor is it

readily apparent to the Court.  Under the circumstances, the Court finds that Plain Avenue

Storage and Malden Storage have not proved their counterclaims for breach of the implied

covenant of good faith and fair dealing.

196.    Neither Plain Avenue Storage nor Malden Storage breached the implied covenant

of good faith and fair dealing as to their respective contracts.  The parties operated in good faith

by, among other things, offering to pay for change orders even when they determined that the

work was BRT's responsibility (*see, e.g.*, Ex. 110.14, at 2) and assisting BRT in its pay-

application submissions.  (*See, e.g.*, Ex. 1565-69 (summaries of pay applications for Malden

project)).

197.    Accordingly, neither BRT, Plain Avenue Storage, nor Malden Storage is liable for

breach of the implied covenant of good faith and fair dealing.

### E.   Conversion

#### 1.   New York – Counterclaim 3 (Plain Avenue Storage v. Wallace and BRT)

198.    Under New York law, "[c]onversion occurs when a defendant exercises

unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession." *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997) (quoting *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996)).

199.    "[I]t is well-settled that an action will lie under New York law for conversion of money when there is an obligation to return or otherwise treat in a particular manner the specific money in question." *Id.* (quoting *Vanderbilt Univ. v. Dipsters Corp.*, 1986 WL 10471, at *3 (S.D.N.Y. Sept. 17, 1986)).

200.    "The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *Fashions Outlet of America, Inc. v. Maharaj*, 1991 WL 143421, at *2 (S.D.N.Y. July 22, 1991) (internal quotation marks and citations omitted).

201.    Under New York law, "corporate officers may be held personally liable for their tortious acts . . . even if they are made on behalf of the corporate entity." *Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 461 (E.D.N.Y. 2013); *see also Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) ("Though such individuals are not generally liable for their corporation's debts or its breach of a contract . . . officers and directors of a corporation may be held liable for fraud if they participate in it or have actual knowledge of it." (citations and internal quotation marks omitted)).

### 2.    Massachusetts – Counterclaim 9 (Malden Storage v. Wallace and BRT)

202.    Under Massachusetts law, a defendant is liable for conversion if he "intentionally or wrongfully exercise[s] acts of ownership, control or dominion over personal property to which he has no right of possession at the time." *In re Brauer*, 452 Mass. 56, 67 (2008) (internal

quotation marks, alteration, and citations omitted).[22]

203.    To prove conversion, a plaintiff must further demonstrate that "the defendant either did some positive wrongful act with the intention to appropriate the property to himself or to deprive the rightful owner of it, or destroyed the property." *Kelley v. LaForce*, 288 F.3d 1, 11-12 (1st Cir. 2002).

204.    "It is no defense to conversion for defendant to claim that he acted in good faith, reasonably believing that he had a legal right to possession of the goods." *Id.* at 12.  To be liable, a defendant does not need intent "to deprive the owner permanently of the property.  Rather, one only need intent to exercise dominion or control over the property of another and can be held liable for conversion even if the property over which he exercised control was believed to be his own." *In re Zak*, 573 B.R. 13, 42 (Bankr. D. Mass. 2017) (quoting *In re Sloane*, 2002 WL 1000956, at *6 (Bankr. D. N.H. Mar. 25, 2002)) (internal alteration omitted).

205.    "Under Massachusetts law, corporate officers are personally liable for any tortious activity in which they personally participate." *Chesterton Capital, LLC v. Holley*, 2017 WL 6209189, at *13 (D. Mass. Dec. 8, 2017) (quoting *Frontier Mgmt. Co. v. Balboa Ins. Co.*, 658 F. Supp. 987, 991 (D. Mass. 1986)).

---

[22] The First Circuit has articulated the elements of the tort somewhat differently, holding that a plaintiff alleging conversion under Massachusetts law must show that:

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993); *see also Neelon v. Krueger*, 2015 WL 4647931, at *2 n.3 (D. Mass. Aug. 5, 2015) ("In cases where a defendant had legitimate possession of property, for example, a bailee holding goods for a bailor, Massachusetts law recognizes a further element that requires the plaintiff to have requested the property's return and been denied.").

### 3.   **Conclusion**

206.    BRT exercised unauthorized possession of funds of Plain Avenue Storage when it received $185,000 from Banner intended for the second payment for Storage Structures on the New Rochelle project and did not make that payment to Storage Structures. *See LoPresti*, 126 F.3d at 41 ("[I]t is well-settled that an action will lie under New York law for conversion of money where there is an obligation to return or otherwise treat in a particular manner the specific money in question.").

207.    Wallace admitted at trial that BRT did not pay Storage Structures the $185,000. (Tr. 3:9).  BRT also did not return $185,000 to Banner or credit Banner that amount.  (Tr. 6:64).

208.    Wallace claims that there was a secret deal between him, Henry, and Delaney that BRT would be paid the full disputed amount for its work on the Lynn project by invoices submitted through the New Rochelle and Malden projects, presumably through the creation of false paperwork.  Specifically, he claims that BRT was entitled to the $185,000 as compensation for the $178,171 deductive change order that was executed as part of the settlement for the Lynn project.  (Tr. 4:14; Ex. 1495, at 2).

209.    The Court does not find Wallace's testimony as to the claimed secret deal to be credible, and it is not supported by the documentary evidence.[23]

---

[23] Wallace's testimony, which spanned more than four days at trial, was often unsupported by the record, if not wholly contradicted by it.  He was argumentative and evasive, and at times refused to answer questions.  The following exchange provides one example:

Q. So why [is Storage Structures] invoicing you? Why is Storage Structures invoicing you for $165,000 if not for the steel proposal that they sent you and the steel that was going to be put into the Malden project?

A. I disagree.

Q. No, that's not an answer to the question.

A. Then you'll have to repeat the question.

210.    BRT was not entitled to retain the $185,000, by agreement or otherwise.  At the conclusion of the Lynn project, Lynn Storage and BRT agreed that Lynn Storage would pay $300,000 to BRT for its final proposed change orders.  (Ex. 1001; Tr. 6:102).  BRT certified that it was paid in full for its work on the Lynn project.  (*See, e.g.*, Exs. 1004, 1006, 1007).

211.    Furthermore, the New Rochelle contract included an integration clause that stated that it represented "the entire and integrated agreement between the parties hereto and supersede[d] prior negotiations, representations or agreements, either written or oral."  (Ex. 1026, at 3).  Even if there had been a secret oral side agreement, it was superseded by that contract.

212.    Heath Mulkey credibly testified that the $185,000 was for work that Storage Structures performed for BRT on the New Rochelle project and that Storage Structures expected to be paid for that work after it issued the invoice for $185,000.  (Tr. 7:74-76).

213.    Wallace had knowledge of, and in fact personally participated in, the conversion of funds from Plain Avenue Storage.

214.    Accordingly, BRT and Wallace are liable to Plain Avenue Storage for conversion of $185,000.

215.    BRT likewise exercised unauthorized possession of funds of Malden Storage when it received $142,282 from Banner for the payment intended for Storage Structures on the Malden project and did not make that payment to Storage Structures.

216.    BRT did not pay Storage Structures $142,282 of the $165,000 invoice that it

---

Q. Why is Storage Structures billing you $165,000 when the money that you claim in that sum you say was due to you from Banner from the Lynn project?

A. That's what I said, yes.

(Tr. 3:16-17).

submitted for work on the Malden project.  (Tr. 7:82).  Nor did it return the $142,282 to Banner

or credit Banner that amount.  (Tr. 6:67).

217.　　Wallace claims that there was a secret side agreement that BRT would be paid

$142,000 as compensation for the punch-list work that BRT completed on the Lynn project.  (Ex.

1495, at 3).

218.　　The Court does not find Wallace's testimony as to the claimed secret deal to be

credible, and it is not supported by the documentary evidence.

219.　　Again, BRT was not entitled to that money, by agreement or otherwise.  The

punch-list contract provided that Lynn Storage would pay $291,818.69 to BRT for the punch-list

work.  (Ex. 1008, at 2).  BRT was in fact paid that amount for that work.  (*See, e.g.*, Tr. 4:9-10;

Exs. 1012, 1013, 1017).

220.　　Furthermore, the Malden contract included an integration clause that stated that it

represented "the entire and integrated agreement between the parties hereto and supersede[d]

prior negotiations, representations or agreements, either written or oral."  (Ex. 1182, at 3).

Again, even if there had been a secret oral side agreement, it was superseded by that contract.

221.　　Heath Mulkey credibly testified that the $165,000 was for work that Storage

Structures performed for BRT on the Malden project and that Storage Structures expected to be

paid for that work after it issued the invoice for $165,000.  (Tr. 7:80-85).

222.　　Wallace had knowledge of, and in fact personally participated in, the conversion

of funds from Malden Storage.

223.　　Accordingly, BRT and Wallace are liable to Malden Storage for conversion of

$142,282.

F.   **Fraud**

    1.   **New York – Counterclaim 5 (Plain Avenue Storage v. Wallace and BRT)**

224.   To prove a claim for fraud under New York law, "a plaintiff must show, by clear and convincing evidence, that the defendant made a material misrepresentation of fact," or an omission of a material fact coupled with a duty of disclosure, "knowing of its falsity and with the intent to induce reliance, and that the plaintiff justifiably relied on that misrepresentation to her detriment." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 491 (2d Cir. 2014) (citing *Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d 330, 349-50 (1999); *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)).

    2.   **Massachusetts – Counterclaim 11 (Malden Storage v. Wallace and BRT)**

225.   To prove a claim for fraud under Massachusetts law, a plaintiff must show that a defendant "(1) made a false representation of material fact; (2) with knowledge of its falsity; (3) for the purpose of inducing the plaintiff[] to act on this representation; (4) that the plaintiff[] reasonably relied on the representation as true; and (5) that [the plaintiff] acted upon it to their damage." *AcBel Polytech, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 928 F.3d 110, 122 (1st Cir. 2019) (internal quotation marks omitted).

226.   "Proof of intent to deceive is not required, so long as there is proof of a false representation of fact susceptible of the speaker's knowledge." *Cummings v. HPG Int'l, Inc.*, 244 F.3d 16, 22 (1st Cir. 2001).  The claimant must also "set[] forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013) (quoting *North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 13 (1st Cir. 2009)).

### 3.   **Conclusion**

227.   On behalf of BRT, Wallace knowingly submitted sworn statements, pay applications, and invoices to Plain Avenue Storage that indicated that BRT had paid $224,900 to Storage Structures.  (Tr. 5:96; Ex. 107.9; Tr. 5:114-15; Ex. 1094; Tr. 7:66-67; Exs. 1111; 107.17, 107.18; Exs. 1160, 1163, 1167).  These statements were false at the time they were made and were made for the purpose of inducing Plain Avenue Storage to pay the money to BRT.  Plain Avenue Storage justifiably relied on those false sworn statements and pay applications when it paid $224,900 to BRT.  (Exs. 1160, 1164, 1168).

228.   In fact, BRT paid only $39,900 of that money to Storage Structures.  (Ex. 1161, at 1; Ex. 1412; Tr. 7:75; Tr. 7:82).

229.   Wallace had knowledge of, and in fact personally participated in, the fraud committed against Plain Avenue Storage related to the Storage Structure payments.

230.   Accordingly, BRT and Wallace are liable for fraud under New York law.

231.   On behalf of BRT, Wallace knowingly submitted sworn statements, pay applications, and an invoice to Malden Storage that indicated that BRT had paid $165,000 to Storage Structures.  (Exs. 207.1; 208.1; 209.1; 1193).  These statements were false at the time they were made and were made for the purpose of inducing Malden Storage to pay the money to BRT.  Malden Storage justifiably relied on those false sworn statements and pay applications when it paid $165,000 to BRT.  (Ex. 1194, at 1).

232.   In fact, BRT paid only $22,718 of that money to Storage Structures.  (Ex. 1200).

233.   Wallace had knowledge of, and in fact personally participated in, the fraud committed against Malden Storage related to the Storage Structure payments.

234.   Accordingly, BRT and Wallace are liable for fraud under Massachusetts law.

G.      **Failure to Make Prompt Payment**

    1.      **Massachusetts – Count 7 (BRT v. Malden Storage)**

235.    The Massachusetts Prompt Payment Act, Mass. Gen. Laws ch. 149, § 29E,

"imposes mandatory requirements that have the net effect of ensuring prompt review and

payment of periodic payment requisitions submitted by contractors on construction projects

within the scope of the Act, and requiring written statements of reasons for any rejection or

reduction of requisitions." *Tocci Building Corp. v. IRIV Partners, LLC*, 2020 WL 8182898, at

*1 (Nov. 20, 2020) (citing Mass. Gen. Laws ch. 149, § 29E(c)).

236.    It applies to private projects with prime contracts, entered into on or after

November 8, 2010, which have original values of $3 million or more, subject to several

exceptions. *See* Mass. Gen. Laws ch. 149, § 29E(a).  It also applies to "any party who would be

entitled to a Massachusetts mechanic's lien, which includes prime contractors and first and

second tier subcontractors." *Tocci Building*, 2020 WL 8182898, at *1 (citing Mass. Gen. Laws

ch. 149, § 29E(a)).

237.    Subsection (c) governs contractual provisions concerning pay applications and

approval or rejection of pay applications.  It provides that "[e]very contract for construction shall

provide reasonable time periods within which: (i) a person seeking payment under the contract

shall submit written applications for periodic progress payments; (ii) the person receiving the

application shall approve or reject the application, whether in whole or in part; and (iii) the

person approving the application shall pay the amount approved."  Mass. Gen. Laws ch. 149, §

29E(c).  It further provides that those time periods shall not exceed:

    (i) for submission, 30 days, beginning with the end of the first calendar month
    occurring at least 14 days after the person seeking payment has commenced
    performance;

    (ii) for approval or rejection, 15 days after submission; provided, however, that

the time period, as applicable to approval or rejection by the person at each tier of contract below the owner of the project, may be extended by 7 days more than the time period applicable to the person at the tier of contract above the person; and

(iii) for payment, 45 days after approval, unless the payment is subject to the condition of receipt of payment by a third person but only to the extent enforceable under subsection (e).

*Id.*

238.    Any full or partial rejection of a pay application must be made in writing, must explain the factual and contractual basis for the rejection, and must certify that the rejection is made in good faith. *See id.*[24] If the pay application is not rejected within the 15-day period, the application is "deemed to be approved." *Id.* Payment must be made within 45 days after approval. *See id.* A "deemed approval" can be reversed if a rejection is properly issued before the end of that 45-day period. *See id.*

239.    In effect, "a recipient of a payment requisition—typically a project owner or manager—has a total of 60 days after submission of a payment requisition to object to it, and any rejection must comply with three requirements under the Act:  it must (1) be in writing; (2) include an explanation of the factual and contractual basis for the rejection; and (3) be certified to have been made in good faith." *Tocci Building*, 2020 WL 8182898, at *2.

240.    Subsection (d) governs contractual provisions concerning change orders and approval or rejection of change orders. It provides that "[e]very contract for construction shall provide a reasonable time period within which a written request submitted by a person seeking an increase in the contract price shall be approved or rejected, whether in whole or in part." Mass. Gen. Laws ch. 149, § 29E(d). It further provides that that time period "shall not exceed 30

---

[24] The Prompt Payment Act provides that "[a] communication required in this section to be in writing may be submitted in electronic form and by electronic means." Mass. Gen. Laws ch. 149, § 29E.

days after the later of commencement of the performance of the work on which the request is
based or submission of the written request . . . ."  *Id.*

241.    Like rejections of pay applications, rejections of change-order requests, "whether
in whole or in part, shall be made in writing, shall include an explanation of the factual and
contractual basis for the rejection and shall be certified as made in good faith."  *Id.*  Change-
order requests that are neither approved nor rejected within a 30-day period are "deemed to be
approved and may be submitted for payment within the next application for a periodic progress
payment, unless it is rejected before the date payment is due."  *Id.*

242.    If a pay application or a change-order request is rejected, the party who submitted
the application or request may commence the contractual dispute-resolution procedures.  *See*
Mass. Gen. Laws ch. 149, § 29E(c), (d).  Contractual provisions that "require[] a party to delay
commencement of [such procedures] until a date later than 60 days after the rejection [are] void
and unenforceable."  *Id.*

243.    Subsection (e) governs "pay-if-paid" clauses:

A provision in a contract for construction which makes payment to a person
performing the construction conditioned upon receipt of payment from a third
person that is not a party to the contract shall be void and unenforceable,
except . . . to the extent of amounts not received from the third person because the
person performing the construction failed to perform under its contract and failed
to cure the non-performance within the time required by the contract after receipt
of written notice as provided in the contract or, in the case of contract lacking a
cure and notice provision, failed to cure the non-performance within 14 days after
receipt of written notice of the failure to perform.

*Id.* § 29E(e).  That exception "shall be expressly stated in any conditional payment provision and
the person seeking to enforce the payment condition shall have the burden of proof as to each
element."  *Id.*

244.    Contractual provisions that require a contractor to continue performance beyond
30 days of nonpayment are unenforceable, except in cases where (i) the nonpayment arises from

a dispute "regarding the quality or quantity of the construction" or (ii) there is "a default by the person under the contract for construction after approval of the payment," provided "that the person has received . . . prior written notice of such dispute or default certified as made in good faith and . . . all sums due less any amounts attributable to the dispute or default." *Id.* § 29E(f).

245.    Subsection (g) provides that "[a] provision in a contract for construction which purports to waive or limit any provisions of this section shall be void and unenforceable." *Id.* § 29E(g).

246.    Mass. Gen. Laws ch. 149, § 29E does not include a private cause of action. Furthermore, no court to date has found such a right of action by implication.  Therefore, BRT may not bring an action based on any purported violation of that statute by Malden Storage.

247.    One decision by the Massachusetts Superior Court concluded that the statute "supplement[s]" the terms of the contract and "trump[s] any contrary provisions within it," and that failure to adhere to the provisions of Mass. Gen. Laws ch. 149, § 29E can underlie a claim for breach of contract.  *See Tocci Building*, 2020 WL 8182898, at *6.

248.    Even assuming Malden Storage violated Mass. Gen. Laws ch. 149, § 29E, however, any such violation would not constitute a breach of contract here.  BRT's repeated, material failures to comply with the processes to submit pay applications and change-order requests vitiate any obligation Malden Storage had under Mass. Gen. Laws ch. 149, § 29E.  *See Verderber*, 1999 WL 525953, at *3 ("A material breach by one party excuses the other party from further performance under the contract." (quoting *Ward*, 15 Mass. App. Ct. at 100)).  *See, e.g.*, Ex. 1569 (summary of pay applications #5 and #6 for Malden project).

H.    **Tortious Interference with Advantageous Relations**

1.    **New York – Counterclaim 4 (Plain Avenue Storage v. Wallace and BRT)**

249.    Under New York law, to prove tortious interference with prospective economic relations, a plaintiff must show that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Brown Media Corp. v. K & L Gates, LLP*, 586 B.R. 508, 529 (E.D.N.Y. 2018) (quoting *Catskill Dev., LLC v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).

250.    Even though inducing breach of contract and interfering with a nonbinding "economic relation" are both cognizable torts under New York law, they require proof of different degrees of culpability on the part of a defendant:

> [T]he degree of protection available to a plaintiff for a competitor's tortious interference with contract is defined by the nature of the plaintiff's enforceable legal rights.  Thus, where there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior.  Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant.

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 189-90 (2004) (quoting *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.*, 87 N.Y.2d 614, 621 (1996)).

251.    Thus, "a defendant who induced the breach of a binding contract could be liable even if the defendant was engaged in lawful behavior," but the same is not true "where the plaintiff complained only of interference with prospective contract rights." *Id.* at 190 (internal quotation marks omitted).  In that case, "where a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not 'lawful' but 'more culpable.'" *Id.*  Therefore, "as a general rule, the defendant's conduct must amount to a crime or

an independent tort . . . to create liability for interference with prospective contracts or other

nonbinding economic relations." *Id.*[25]

252.     One exception to that general rule is when "a defendant engages in conduct for

the sole purpose of inflicting intentional harm on plaintiffs." *Id.* (internal quotation marks

omitted).

## 2.     <u>Massachusetts – Counterclaim 10 (Malden Storage v. Wallace and BRT)</u>

253.     Under Massachusetts law, "[t]he tort of intentional interference with

advantageous relations protects a plaintiff's present and future economic interests from wrongful

interference." *See Blackstone v. Cashman*, 448 Mass. 255, 259 (2007).

254.     Under Massachusetts law, to prove tortious interference with advantageous

relations, a plaintiff must show that

> (1) he had an advantageous relationship with a third party (e.g., a present or
> prospective contract or employment relationship); (2) the defendant knowingly
> induced a breaking of the relationship; (3) the defendant's interference with the
> relationship, in addition to being intentional, was improper in motive or means;
> and (4) the plaintiff was harmed by the defendant's actions.

*Id.* at 260; *see also Rando v. Leonard*, 826 F.3d 553, 556 (1st Cir. 2016).[26]

255.     "[T]he plaintiff need not prove the loss or diminution of a fully formed contract,"

but "she must, at a bare minimum, prove harm to a 'probable future business relationship from

which there is a reasonable expectancy of financial benefit . . . .'" *Sindi v. El-Moslimany*, 896

---

[25] The *Carvel* court also indicated that the "wrongful means" identified in the Restatement (Second) of Torts—"physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure"—would constitute "more culpable" conduct that would expose a defendant to liability for interference with prospective economic relations. *Carvel Corp.*, 3 N.Y.3d at 191. But "persuasion alone" even if "knowingly directed at interference with the contract" would not constitute a "wrongful means." *Id.*

[26] When interference with an actual contract is alleged, courts sometimes refer to the tort as "intentional interference with contractual relations." *See, e.g.*, *Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 652-53 (D. Mass. 2015).

F.3d 1, 25 (1st Cir. 2018) (quoting *Owen v. Williams*, 322 Mass. 356, 362 (1948)). "Mere speculation regarding potential future business opportunities is insufficient to prove this element." *Id.* (citing *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 48 (1st Cir. 2002)). Instead, "there must be competent evidence of a specific business relationship, the consummation of which was reasonably likely." *Id.*

256.    To demonstrate improper means, "a plaintiff must prove improper conduct beyond the fact of the interference itself." *Bartle v. Berry*, 80 Mass. App. Ct. 372, 380 (2011) (citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 816-17 (1990); *Cavicchi v. Koski*, 67 Mass. App. Ct. 654, 657 (2006)).

### 3.    Conclusion

257.    Wallace and BRT instructed subcontractors to not interact with Plain Avenue Storage. However, Plain Avenue Storage did not have existing, enforceable contracts with those subcontractors. Accordingly, even if Plain Avenue Storage had prospective "business relations" with such subcontractors based on the possibility of a future contract, Wallace and BRT's conduct—sending letters to subcontractors stating "[p]lease do not talk with the owner or its representatives at this time until this is resolved" (Ex. 1542, at 2)—did not "amount to a crime or an independent tort," which is necessary for a party to be liable for interference with prospective economic relations under New York law. *See Carvel Corp.*, 3 N.Y.3d at 190-91.

258.    Malden Storage had prospective contractual relationships with BRT's subcontractors, including KOH Architecture and JAG Engineering.

259.    BRT knowingly interfered with those relationships by instructing its subcontractors, including KOH and JAG Engineering, not to talk with Malden Storage until its

dispute with Malden Storage was resolved.[27]

260.    BRT's interference was improper in motive or means because it was done to gain leverage over Malden Storage in their dispute arising out of the Malden contract.

261.    Malden Storage was harmed by BRT's actions in the form of extra costs associated with completing the Malden project after termination of BRT.  Malden Storage presented evidence showing that it had to pay $39,500 to a new architect because KOH did not work with it following termination of the Malden contract.  (Ex. 1189, at 1).  It presented further evidence that it had to pay $12,046.25 to a new engineer because JAG did not work with it following termination of the Malden contract.  (*Id.*).

262.    Wallace had knowledge of, and in fact personally participated in, the interference with advantageous relations by BRT.

263.    Accordingly, BRT and Wallace are liable for tortious interference with advantageous relations under Massachusetts law.

I.    **Unfair or Deceptive Acts or Practices**

1.    **New York – Counterclaim 6 (Plain Avenue Storage v. BRT)**

264.    N.Y. Gen. Bus. Law § 349(a) makes unlawful "[d]eceptive acts or practices in the conduct of any business trade or commerce or in the furnishing of any service" in New York. N.Y. Gen. Bus. Law § 349(a).

265.    It provides a private cause of action to consumers seeking to recover damages caused by deceptive acts or practices:

[A]ny person who has been injured by reason of any violation of this section may

---

[27] Even though the letters that Wallace sent to the subcontractors that were entered into evidence appear to concern the termination of the New Rochelle contract, and Henry's testimony concerning the interference is not entirely clear, BRT and Wallace's interference extended to the Malden project.  According to Henry, Malden Storage attempted to engage at least KOH Architecture and JAG Engineering after the termination of the Malden contract, and they refused.  (Tr. 8:41-44).

bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions.

*See id.* § 349(h).

266.     To prevail on a cause of action under § 349, a plaintiff must prove three elements: (1) the defendant's act or practice was consumer oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result.  *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).

267.     Section 349 "is directed at wrongs against the consuming public," and therefore a plaintiff bringing a claim under § 349 must show "conduct of the defendant that is consumer-oriented."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 24-25 (1995).  A plaintiff need not show that a defendant engaged in recurring acts to have a cognizable claim, "but instead must demonstrate that the acts or practices have a broader impact on consumers at large."  *Id.* at 25.

268.     Private contract disputes, such as those that are based on "a single shot transaction," typically do not amount to consumer-oriented conduct that is actionable under § 349.  *See Plavin v. Group Health Incorporated*, 35 N.Y.3d 1, 10 (2020).  Courts have recognized, however, an exception where a plaintiff can show, despite the existence of a private contract, that a defendant's conduct affected consumers at large.  *See, e.g.*, *Carroll v. U.S. Equities Corp.*, 2019 WL 4643786, at *13 (N.D.N.Y. 2019).

### 2.     Massachusetts – Count 8 (BRT v. Malden Storage) and Counterclaim 12 (Malden Storage v. BRT)

269.     Chapter 93A prohibits those engaged in trade or commerce from employing "[u]nfair methods of competition and unfair or deceptive acts or practices."  Mass. Gen. Laws ch. 93A, § 2.

270.     Section 11 provides that "[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property . . . as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice" may bring an action against that person. *Id.* § 11.

271.     To determine whether a business practice is unfair under Chapter 93A, courts must consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) (internal quotation marks and citation omitted).

272.     Run-of-the-mill breaches of contract do not meet that standard. *See Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000) ("A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A." (citing *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996))).  Neither does "withholding payment based on a genuine dispute about what a contract requires." *Jasty v. Wright Med. Tech., Inc.*, 528 F.3d 28, 38 (1st Cir. 2008) (citing *Duclersaint v. Federal Nat'l Mortgage Ass'n*, 427 Mass. 809, 814 (1998)); *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d 47, 56 (1st Cir. 1998) ("Where there is a good faith dispute over whether payment is actually owed, and that dispute is clearly articulated, it also appears that there is no Chapter 93A liability.").

273.     A party may nonetheless be liable under Chapter 93A if it uses a breach of contract "as a lever to obtain [an] advantage." *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992); *Commercial Union Ins. Co.*, 217 F.3d at 40 (explaining that a breach of contract

must "rise[] to the level of commercial extortion or a similar degree of culpable conduct" to violate Chapter 93A (internal quotation marks omitted)).  A party may also be liable under Chapter 93A if it attempts to "extract a favorable settlement . . . for less than the amount . . . owed by repeatedly promising to pay, not doing so, stringing out the process, and forcing [the other party] to sue."  *Arthur D. Little, Inc.*, 147 F.3d at 55-56.

### 3.   Conclusion

274.    Even if BRT's conduct during the New Rochelle project constituted a deceptive act or practice under § 349, it was not consumer-oriented.  It related to a private contract between two parties and had no effect on consumers at large.

275.    Accordingly, BRT is not liable under N.Y. Gen. Bus. Law § 349.

276.    Likewise, BRT is not liable under Mass. Gen. Laws ch. 93A.  As noted, it committed fraud and converted funds of Malden Storage.  To the extent that such conduct could constitute an "unfair or deceptive" act or practice under Chapter 93A, BRT did not use that conduct "as a lever to obtain [an] advantage" over Malden Storage.  *See Atkinson*, 33 Mass. App. Ct. at 226.  Its conduct therefore did not "rise[] to the level of commercial extortion or a similar degree of culpable conduct" that is necessary for Chapter 93A liability.  *See Commercial Union Ins. Co.*, 217 F.3d at 40.

277.    Furthermore, although BRT's intentional inference with subcontractors may constitute an "unfair or deceptive" act or practice that it used "as a lever to obtain [an] advantage" during the parties' dispute arising from the Malden contract, Malden Storage did not argue at trial or in its post-trial briefing that its Chapter 93A claim was premised on BRT's interference with its subcontractors.  It has therefore waived any claim under Chapter 93A to the extent that it is based on that conduct.

278.    Malden Storage is not liable under Mass. Gen. Laws ch. 93A.  Its conduct

indicates that it operated in good faith.  For example, Radcliff repeatedly outlined specific errors in pay applications to assist BRT in its revisions, which in turn BRT would fail to timely correct. (*See, e.g.*, Ex. 1565-69 (summaries of pay applications for Malden project)).  Similarly, Malden Storage representatives timely responded to and negotiated change-order requests, either approving them, providing updates, or requesting additional necessary documentation.  (*See, e.g.*, Exs. 211.2, 211.3, 211.4, 213, 217.1, 217.2, 218, 219.1).  To the extent that Malden Storage's responses "strung out the process," as BRT alleges, they were far short of unfair or deceptive conduct within the meaning of Chapter 93A.

## V.      Termination-for-Cause Damages

279.    BRT's material breaches of contract entitled Plain Avenue Storage and Malden Storage to terminate their respective contracts for cause.  (Ex. 1026, at 52; Ex. 1182, at 46).  At trial, Plain Avenue Storage and Malden Storage presented evidence of the cost impact of terminating the contracts for cause.  That evidence primarily consisted of testimony from Bill Henry and Terence Rodgers, Banner's expert witness; summary exhibits, supported by underlying documentation, compiling the costs of the New Rochelle and Malden projects; and Rodgers's expert report.  (Tr. 8:31-36; Tr. 8:91-97; Ex. 1033; Ex. 1189; Ex. 1539).[28]

280.    A termination-for-cause impact analysis consists of examining the costs, "over and above what was paid to the previous contractor," that is paid to a subsequent contractor who is brought in "to complete the work."  (Tr. 8:82).

281.    Schedule A of Rodgers's report summarizes the cost impacts of the terminations for cause of the New Rochelle and Malden contracts.  (Ex. 1539.2, at 1).[29]  Rodgers testified that

---

[28] Expert reports are hearsay and thus typically inadmissible at trial.  Here, however, the parties agreed to enter their respective experts' reports into evidence without objection.  (Tr. 8:28-29).

[29] Schedule A also appears as part of Rodgers's report.  (*See* Ex. 1539, at 54).

the formula used in Schedule A is "based on the termination for cause portions of the contract" and "put[s] the owner back in the place they should have been in but for the . . . design-builder's actions or omissions that caused them to be terminated."  (Tr. 8:91).

282.    For each project, the formula first determines "the cost of completing [the project] according to the BRT scope."  (Tr. 8:96).  It then subtracts from that cost (1) the Guaranteed Maximum Price of the relevant contract with BRT and (2) the total costs of the approved change orders completed by BRT.  (*Id.*).  In doing so, it calculates the amount that Banner paid to complete the project according to the BRT scope over and above what it was to pay BRT for that work.  (*Id.*).

283.    Henry testified concerning the various costs used in Schedule A and the underlying source information used to determine those costs.  (Tr. 8:31-37).  He further testified that Banner provided Rodgers that source information to prepare Schedule A.  (Tr. 8:26-27, 8:30-31).[30]

284.    Based on the evidence as to damages on the Malden contract, which the Court accepts with one exception, the cost impact of the termination for cause of the Malden contract was $3,326,704.51.  (Ex. 1539.2, at 1).[31]

285.    Based on the evidence as to damages on the New Rochelle contract, which the Court accepts, the cost impact of the termination for cause of the New Rochelle contract was

---

[30] Schedule A cross-references spreadsheets that summarize the source information.  (Ex. 1539.2, at 3-16).

[31] Exhibit 1573 summarizes Malden Storage's direct payments to subcontractors after termination of BRT and includes documents that purportedly represent evidence of those direct payments.  For the reasons discussed below, Exhibit 1573 will be struck from the record.

As a result, there is no admissible evidence supporting the "Direct to Sub" line of Schedule A as to the Malden contract and thus Malden Storage cannot recover for the costs included in that line.  Accordingly, when determining the damages to which Malden Storage is entitled, the cost impact of the termination for cause of the Malden contract will be reduced by the amount of the "Direct to Sub" line.

$3,847,715.14.  (*Id.*).

286.    A termination-for-cause impact analysis also includes examining the schedule impacts of a termination for cause.

287.    Schedule B of Rodgers's report summarizes the schedule impacts of the terminations for cause of the New Rochelle and Malden contracts.  (Ex. 1539.2, at 2).[32]  Rodgers testified that the formula "is based on the liquidated damages clause[s]" in the contracts and it "establish[es] what was the contractual standard completion at the time of the . . . termination with BRT, and then just follow[s] all the way down to show what the contractual substantial completion date was for ARCO."  (Tr. 8:97-98).

288.    Henry testified concerning the formula and underlying source materials used in Schedule B.  (Tr. 8:37-39).

289.    The substantial completion date for the Malden contract between Malden Storage and BRT was May 7, 2017.  (Ex. 1539.2, at 2).  The substantial completion date for the contract between Malden Storage and ARCO was December 28, 2017.  (*Id.*).

290.    The liquidated-damages provision of the Malden contract provided for a 15-day grace period during which liquidated damages do not accrue.  (Ex. 1182, at 4).  As a result, as to the Malden contract, 220 days are subject to liquidated damages.

291.    The Malden contract provides that Malden Storage is entitled to $1,000 of liquidated damages each day after the grace period ends following the substantial completion date.  (*Id.*).  Malden Storage is therefore entitled to $220,000 in liquidated damages.

292.    The substantial completion date for the New Rochelle contract between Plain Avenue Storage and BRT was March 19, 2017.  (Ex. 1539.2, at 2).  The substantial completion

---

[32] Schedule B also appears as part of Rodgers's report.  (*See* Ex. 1539, at 55).

date for the contract between Plain Avenue Storage and ARCO was July 31, 2017.  (*Id.*).

293.    The liquidated-damages provision of the New Rochelle contract provided for a 15-day grace period during which liquidated damages do not accrue.  (Ex. 1026, at 4).  As a result, as to the New Rochelle contract, 119 days are subject to liquidated damages.

294.    The New Rochelle contract provides that Plain Avenue Storage is entitled to $1,000 of liquidated damages each day after the grace period ends following the substantial completion date.  (*Id.*)  Plain Avenue Storage is therefore entitled to $119,000 in liquidated damages.

295.    Plain Avenue Storage and Malden Storage, as the prevailing parties in the present dispute, are further entitled to receive "all of its reasonable costs and expenses incurred in connection with [this] litigation, . . . including reasonable attorneys' fees, filing fees, expert witness fees, discovery expenses, and any other reasonable costs incurred in prosecuting or defending" the present action.  (Ex. 1026, at 37; Ex. 1182, at 31).  Those costs and expenses will be determined at a future date in a separate proceeding.

## VI.    **Motion to Strike**

296.    BRT and Wallace have moved to strike Exhibit 1573 and the first page of Exhibit 1574.  As noted, Exhibit 1573 purportedly evidences payments made by Malden Storage to subcontractors for the Malden project after the termination of BRT.  It consists of a cover page that summarizes the alleged payments and the underlying documentation of the payments, such as checks and confirmations of electronic money transfers.  Exhibit 1574 is an analogous exhibit for the New Rochelle project.

297.    BRT and Wallace initially contended that both exhibits should be struck in their

entirety because the underlying documentation was not disclosed to them before trial.[33]  In fact, the underlying documentation for Exhibit 1574 had been disclosed by Banner as part of its initial disclosures.  BRT and Wallace therefore now only contend that the cover page of Exhibit 1574, which summarizes the underlying documentation, should be struck.

298.   Under Fed. R. Evid. 1006, a proponent "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."  Fed. R. Evid. 1006.  To use a summary, a proponent "must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."  *Id.*

299.   Here, the cover page of Exhibit 1574 is a summary offered by Banner of the checks and electronic transfers made to certain subcontractors.  Radcliff testified that she created the cover page based on the underlying checks and electronic transfers.  (Tr. 6:53-54).  Banner made duplicates of those checks and electronic transfers available to the other parties, before and during trial, and to the Court.  The Court finds that the document is admissible under Fed. R. Evid. 1006.

300.   The fact that Banner did not produce any supporting documentation concerning what the checks and transfers were for, such as copies of invoices or pay applications, arguably affects the probative value of the summary and the underlying documentation.  But it does not affect whether the cover page is an admissible summary of the checks and transfers identified in the supporting documentation.  Likewise, as a summary document produced exclusively for trial, the fact that it was not produced as part of discovery does not affect whether it is admissible.

---

[33] On January 29, 2021, the Court granted BRT and Wallace's motion in limine to exclude any documents responsive to their discovery requests that were not previously produced by Malden Storage and Plain Avenue Storage.  (Dkt. No. 163).

Indeed, according to Banner's counsel, BRT produced a damages summary exhibit for the first time at trial pursuant to an agreement between the parties to allow the admission of such exhibits at trial.

301.    Accordingly, the Court will deny BRT and Wallace's motion to strike to the extent that it seeks to strike the cover page of Exhibit 1574.

302.    BRT and Wallace seek to strike Exhibit 1573 in its entirety.  Unlike the underlying documentation for Exhibit 1574, the parties are unsure whether the underlying documentation for Exhibit 1573 was produced before trial.  BRT and Wallace contend that it was not; Banner states that it "believe[s] that the checks in Exhibit 1573 were [] included in its production to BRT," but that it "has been unable to locate the checks in Exhibit 1573 in its production."  (Banner Opp. at 4).

303.    Banner contends that Exhibit 1573 is nevertheless admissible because the information concerning Malden Storage's payments to subcontractors is included in a spreadsheet supporting Schedule A in its expert report.  (*See* Ex. 1539.2, at 4 ("General Contractor Payment Spreadsheet_MA_BRT Sum Tab")).

304.    Neither that spreadsheet nor the expert report includes the underlying documentation.  That documentation should have been made available to BRT and Wallace as part of Malden Storage's initial disclosures, or at the latest when that information reasonably became available to it.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) ("[A] party must, without awaiting a discovery request, provide to the other parties . . . a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and

extent of injuries suffered.").

305.    Furthermore, Schedule A and the supporting spreadsheet in fact cast some doubt on the reliability of Exhibit 1573. Exhibit 1573 indicates that Malden Storage paid subcontractors $635,997.23 after termination of BRT (Ex. 1573, at 1), whereas Schedule A indicates that Malden Storage paid subcontractors $633,178.88. (Ex. 1539.2, at 1). The fact that the figures do not match provides further support for excluding the exhibit.[34]

306.    As a result, particularly in light of the Court's previous ruling barring the admission of late-disclosed documents, the underlying documents and the summary cover page will be struck.

307.    Accordingly, the Court will grant BRT and Wallace's motion to strike to the extent that it seeks to strike Exhibit 1573.[35]

## VII.    **Cross-Motions for Directed Verdict**

308.    The parties have cross-moved for directed verdicts. BRT and Wallace moved for directed verdict at the close of the presentation of their evidence and again at the close of all evidence. Plain Avenue Storage and Malden Storage moved for directed verdict at the close of all evidence. The Court provisionally denied the motions, without prejudice, on the record.

309.    A motion for a directed verdict in a bench trial is treated as a motion for judgment on partial findings under Fed. R. Civ. P. 52(c). *See Northeast Drilling, Inc. v. Inner Space*

---

[34] By contrast, the total in Exhibit 1574 matches the amount indicated on Schedule A that Plain Avenue Storage paid to subcontractors following BRT's termination on the New Rochelle contract. (*Compare* Exhibit 1574, at 1, *with* Exhibit 1539.2, at 1).

[35] At trial, Malden Storage argued that Exhibit 1573 should be admissible at least as a defense to any claim that BRT makes for damages for money that it either paid to or owes subcontractors, even if it were not admissible for Malden Storage's affirmative case for damages. It reasoned that BRT disclosed at trial, for the first time, that it was seeking such damages and thus Malden Storage's late production of the underlying documentation was justified to rebut that claim. Because the Court has concluded that Malden Storage is not liable to BRT and thus BRT is not entitled to damages, it need not decide whether Exhibit 1573 would be admissible for rebuttal purposes.

*Servs., Inc.*, 243 F.3d 25, 37 (1st Cir. 2001).  "If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue," Rule 52(c) allows the court to "enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Fed. R. Civ. P. 52(c).  A court should enter a judgment under Rule 52(c) only "[w]hen a party has finished presenting evidence and that evidence is deemed . . . insufficient to sustain the party's position."  *Morales Feliciano v. Rullan*, 378 F.3d 42, 59 (1st Cir. 2004).

310.    In light of the foregoing, the Court will deny the parties' cross-motions for directed verdict.

## VIII.  Conclusion

### A.    Motions

311.    BRT and Wallace's motion to strike is GRANTED to the extent that it seeks to strike Exhibit 1573, and otherwise DENIED; and

312.    The parties' cross-motions for directed verdicts are DENIED.

### B.    Findings of Liability

313.    Plain Avenue Storage, LLC is not liable to BRT Management LLC for breach of contract, quantum meruit or unjust enrichment, or breach of the implied covenant of good faith and fair dealing.

314.    Malden Storage, LLC is not liable to BRT Management LLC for breach of contract, quantum meruit or unjust enrichment, or breach of the implied covenant of good faith and fair dealing; for a violation of Mass. Gen. Laws ch. 149, § 29E; or for a violation of Mass. Gen. Laws ch. 93A, § 11.

315.    BRT Management LLC is liable to Plain Avenue Storage, LLC for breach of contract.

316.     BRT Management LLC is not liable to Plain Avenue Storage, LLC for breach of the implied covenant of good faith and fair dealing or a violation of N.Y. Gen. Bus Law § 349.

317.     BRT Management LLC and Brian Wallace are liable to Plain Avenue Storage, LLC for conversion and fraud.

318.     BRT Management LLC and Brian Wallace are not liable to Plain Avenue Storage, LLC for tortious interference with advantageous relations.

319.     BRT Management LLC is liable to Malden Storage, LLC for breach of contract.

320.     BRT Management LLC is not liable to Malden Storage, LLC for breach of the implied covenant of good faith and fair dealing or a violation of Mass. Gen. Laws ch. 93A, § 11.

321.     BRT Management LLC and Brian Wallace are liable to Malden Storage, LLC for conversion, fraud, and tortious interference with advantageous relations.

**C.**     **Relief**

322.     Plain Avenue Storage, LLC is hereby awarded damages from BRT Management LLC in the amount of $3,966,715.14 for breach of contract.

323.     Plain Avenue Storage, LLC is hereby awarded damages from BRT Management LLC and Brian Wallace jointly and severally in the amount of $185,000 for conversion and fraud.

324.     Malden Storage, LLC is hereby awarded damages from BRT Management LLC in the amount of $2,913,525.63 for breach of contract.

325.     Malden Storage, LLC is hereby awarded damages from BRT Management LLC and Brian Wallace jointly and severally in the amount of $142,282 for conversion and fraud.

326.     Malden Storage, LLC is hereby awarded damages from BRT Management LLC and Brian Wallace jointly and severally in the amount of $51,546.25 for tortious interference with advantageous relations.

327.    Because the damage awards to Malden Storage, LLC for breach of contract and tortious interference with advantageous relations are overlapping, Malden Storage LLC may not recover damages totaling more than $2,913,525.63 as to those claims.

328.    Plain Avenue Storage, LLC and Malden Storage, LLC are hereby awarded all reasonable costs and expenses, including reasonable attorneys' fees, associated with this action. Plain Avenue Storage, LLC and Malden Storage, LLC shall file an application for such costs and expenses within 21 days of this order.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: September 10, 2021                     Chief Judge, United States District Court